# UNITED STATES *v.* RADDATZ

No. 79–8.   Argued February 25, 1980—Decided June 23, 1980

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 684. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 686. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 687. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 694.

*Andrew J. Levander* argued the cause *pro hac vice* for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Heymann,* and *Patty Merkamp Stemler.*

*Joan B. Gottschall,* by appointment of the Court, 444 U. S. 923, argued the cause for respondent. With her on the brief was *Terence F. MacCarthy.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari, 444 U. S. 824, to resolve the constitutionality of a provision of the Federal Magistrates Act, 28 U. S. C. § 636 (b)(1)(B), which permits a district court to refer to a magistrate a motion to suppress evidence and authorizes the district court to determine and decide such motion based on the record developed before a magistrate, including the magistrate's proposed findings of fact and recommendations.

I

Respondent Raddatz was indicted on March 31, 1977, in the Northern District of Illinois for unlawfully receiving a firearm in violation of 18 U. S. C. § 922 (h). Prior to trial, respondent moved to suppress certain incriminating statements he had made to police officers and to agents of the Bureau of Alcohol, Tobacco, and Firearms. Over his objections, the District Court referred the motion to a Magistrate for an evidentiary hearing pursuant to the Federal Magistrates Act, 28 U. S. C. § 636 (b)(1)(B).

The evidence received at the suppression hearing disclosed that on August 8, 1976, two police officers responded to a report of a crime in progress. When they arrived at the scene, they observed respondent standing next to one Jimmy Baston, who was lying on the street, bleeding from the head.

---

*\*George F. Galland, Jr.,* filed a brief for the Chicago Council of Lawyers as *amicus curiae* urging affirmance.

Respondent was placed under arrest for illegal use of a weapon and was given *Miranda* warnings. The arresting officers testified that respondent explained at the time of his arrest and after the warning that he had been fighting with Baston over a family dispute and had brought the gun with him in case any of Baston's friends tried to interfere.

In due course, state charges were filed against respondent. One month later, on November 19, 1976, Agents Russell and McCulloch of the Bureau of Alcohol, Tobacco, and Firearms interviewed respondent at his home. According to their testimony at the suppression hearing, the agents had been informed by state officials that a state firearms charge was pending against respondent. The agents questioned respondent about the gun found in his possession at the time he was arrested because it had at one time been owned by an out-of-state man who had been slain in an unsolved homicide. At this interview, respondent gave a different version of the events, stating that he had seized the gun from Baston during their August 8 fight and that he did not know where Baston had obtained a gun. The agents asked respondent to help them locate Baston and told him they would inform the United States Attorney of his cooperation if he were subsequently prosecuted.

Respondent's testimony before the Magistrate concerning the November 19 interview varied from that of the federal agents. According to his testimony, he was informed that he would shortly be indicted for violations of federal firearms laws, but that if he agreed to cooperate, "somebody would talk to the prosecutor, and it would be dismissed." He also testified that he was told that if he did not agree to help, he could find himself "going to the Federal penitentiary for a long time."

On January 12, 1977, respondent telephoned the agents and requested a meeting. At this interview, he retracted his November 19 version and stated that he had not taken the gun from Baston, but had obtained it from his half-brother.

He testified at the suppression hearing that he made the incriminating statements at the January 12 meeting only after first obtaining confirmation from the agents of their November 19 promise that the indictment would be dismissed if he cooperated. The agents testified that no such promise was ever made to respondent, either on November 19 or on January 12. They testified that at the January 12 meeting respondent agreed to act as an informant and that they gave him $10 at that time to assist him in gathering information.

A final meeting occurred on January 14, 1977. Respondent returned to the local offices of the Bureau of Alcohol, Tobacco, and Firearms, accompanied by his wife and children. He was informed by Agent McCulloch that his case had been referred to the United States Attorney for prosecution. The agents again discussed with him the possibility of his becoming an informant, and repeated their promise that any cooperation would be brought to the attention of the United States Attorney. Agent McCulloch gave respondent $50 to pay expenses of acquiring information.

## II

The focus of respondent's legal argument at the suppression hearing was that under *Malloy* v. *Hogan*, 378 U. S. 1, 7 (1964), and *Bram* v. *United States*, 168 U. S. 532, 542–543 (1897), his confession was not freely and voluntarily given. He contended that he had been induced to utter the incriminating statements through a promise of immunity and sought to demonstrate a course of conduct on the part of the agents supportive of such a promise.

In his report and findings, the Magistrate recommended that the motion to suppress the statements made on August 8, November 19, and January 12 be denied. He made findings that respondent had knowingly, intelligently, and voluntarily made inculpatory statements on all three occasions. Moreover, the Magistrate specifically stated: "I find the testimony of the Alcohol, Tobacco and Firearms Agent more credi-

ble . . . ; I find that Federal agents never advised [respondent] that charges against him would be dismissed, if he cooperated." App. to Pet. for Cert. 41a. The evidence before the Magistrate showed that respondent had altered his version of events on several occasions.

Respondent filed objections to the Magistrate's report. In rendering its decision, the District Court stated that it considered the transcript of the hearing before the Magistrate on the motion to suppress, the parties' proposed findings of fact, conclusions of law, and supporting memoranda, and that it read the recommendation of the Magistrate and heard oral argument of counsel. Finding "that the three statements given by the defendant and sought to be suppressed were made voluntarily," the District Court accepted the recommendation of the Magistrate and denied the motion to suppress.

By agreement of the parties, the court tried respondent on the basis of the transcript of the suppression hearing, and stipulations that the firearm had been manufactured in Florida and that respondent had been convicted of eight felonies. He was found guilty and sentenced to six months' imprisonment to be followed by four and one-half years on probation.

The Court of Appeals reversed. 592 F. 2d 976. It first rejected the statutory arguments, holding that the District Court had the power to refer to a magistrate the motion to suppress and did not abuse its discretion under the statute in deciding the issue without hearing live testimony of disputed questions of fact. Turning to the constitutional issues, the court held that the referral provisions of the Federal Magistrates Act, 28 U. S. C. § 636 (b)(1)(B), did not violate Art. III of the Constitution because the statute required the District Court to make a *de novo* determination of any disputed portion of the Magistrate's proposed findings and recommendations. However, the Court of Appeals held that respondent had been deprived of due process by the failure of the District Court personally to hear the controverted testimony. Where

credibility is crucial to the outcome, "the district court cannot constitutionally exercise its discretion to refuse to hold a hearing on contested issues of fact in a criminal case." 592 F. 2d, at 986. The District Court was directed to hold a new hearing.

## III

We first address respondent's contention that under the statute, the District Court was required to rehear the testimony on which the Magistrate based his findings and recommendations in order to make an independent evaluation of credibility. The relevant statutory provisions authorizing a district court to refer matters to a magistrate and establishing the mode of review of the magistrate's actions are in 28 U. S. C. § 636 (b)(1). In § 636 (b)(1)(A), Congress provided that a district court judge could designate a magistrate to "hear and determine" any pretrial matter pending before the court, except certain "dispositive" motions. Review by the district court of the magistrate's determination of these nondispositive motions is on a "clearly erroneous or contrary to law" standard.

Certain "dispositive" motions, including a "motion . . . to suppress evidence in a criminal case," are covered by § 636 (b)(1)(B). As to these "dispositive" motions, the district judge may "designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court of [the] motion." However, the magistrate has no authority to make a final and binding disposition. Within 10 days after the magistrate files his proposed findings and recommendations, any party may file objections. The statute then provides:

> "A judge of the court shall make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole

or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." § 636 (b)(1) (emphasis added).

It should be clear that on these dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing. We find nothing in the legislative history of the statute to support the contention that the judge is required to rehear the contested testimony in order to carry out the statutory command to make the required "determination." [1] Congress enacted the present version of § 636 (b) as part of the 1976 amendments to the Federal Magistrates Act in response to this Court's decision in *Wingo* v. *Wedding,* 418 U. S. 461 (1974). *Wingo* held that as a matter of statutory construction, the 1968 Magistrates Act did not authorize magistrates to hold evidentiary hearings in federal habeas corpus cases. Congress amended the Act "in order to clarify and further define the additional duties which may be assigned to a United States Magistrate in the discretion of a judge of the district court." S. Rep. No. 94–625, p. 1 (1976) (hereinafter S. Rep.); H. R. Rep. No. 94–1609, p. 2 (1976) (hereinafter H. R. Rep.).

The bill as reported out of the Senate Judiciary Committee did not include the language requiring the district court to make a *de novo* determination.[2] Rather, it included only the

---

[1] Before the Court of Appeals, respondent apparently conceded that the statute permits the procedures employed here. His statutory arguments in the Court of Appeals were that the reference was invalid because not made pursuant to required enabling rules and that the Court of Appeals should exercise its supervisory powers to prohibit the procedure employed. That court rejected both arguments, and he has pursued neither before this Court.

[2] As originally introduced in the Senate, the bill provided that upon request by a party to a proceeding before a magistrate, the district "court shall *hear* de novo those portions of the report or specific proposed findings of fact or conclusions of law to which objection is made." S. 1283, 94th

language permitting the district court to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Yet the Senate Report which accompanied the bill emphasized that the purpose of the bill's language was to vest "ultimate adjudicatory power over dispositive motions" in the district court while granting the "widest discretion" on how to treat the recommendations of the magistrate. S. Rep., at 10.

The House Judiciary Committee added to the Senate bill the present language of the statute, providing that the judge shall make a "de novo determination" of contested portions of the magistrate's report upon objection by any party. According to the House Report, "[t]he amendment states expressly what the Senate implied: i. e. that the district judge in making the ultimate determination of the matter, would have to give fresh consideration to those issues to which specific objection has been made by a party." The Report goes on to state, quite explicitly, what was intended by "de novo determination":

> "The use of the words 'de novo determination' *is not intended to require the judge to actually conduct a new hearing* on contested issues. Normally, the judge, on application, will consider the record which has been developed before the magistrate and make his own determination on the basis of that record, without being bound to adopt the findings and conclusions of the magistrate. In some specific instances, however, it may be necessary for the judge to modify or reject the findings of the magistrate, to take additional evidence, recall witnesses, or recommit the matter to the magistrate for further proceedings." H. R. Rep., at 3.

---

Cong., 1st Sess. (1975) (emphasis added). As reported out of the Senate Judiciary Committee, however, this language, including the word "hear," was deleted.

Further evidence that Congress did not intend to require the district court to rehear the witnesses is provided in the House Committee Report's express adoption of the Ninth Circuit's procedures for district court review of a magistrate's credibility recommendations as announced in *Campbell* v. *United States District Court for the Northern District of California,* 501 F. 2d 196, cert. denied, 419 U. S. 879 (1974). There, in language quoted in the Committee Report, the court had stated: " 'If [the district court] finds there is a problem as to the credibility of a witness or witnesses or for other good reasons, *it may, in the exercise of its discretion,* call and hear the testimony of a witness or witnesses in an adversary proceeding. It is not required to hear any witness and not required to hold a *de novo* hearing of the case.' " H. R. Rep., at 3–4 (emphasis added), quoting 501 F. 2d, at 206.[3]

Congressional intent, therefore, is unmistakable. Congress focused on the potential for Art. III constraints in permitting a magistrate to make decisions on dispositive motions. See S. Rep., at 6; H. R. Rep., at 8. The legislative history discloses that Congress purposefully used the word *determination* rather than *hearing,* believing that Art. III was satisfied if the ultimate adjudicatory determination was reserved to the district court judge. And, in providing for a "de novo determination" rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations. See *Mathews* v. *Weber,* 423 U. S. 261, 275 (1976).

---

[3] We conclude that to construe § 636 (b) (1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts. We cannot "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *Clark* v. *Uebersee Finanz-Korporation,* 332 U. S. 480, 489 (1947).

## IV

Having rejected respondent's statutory argument, we turn to his constitutional challenge. He contends that the review procedures established by § 636 (b)(1) permitting the district court judge to make a *de novo* determination of contested credibility assessments without personally hearing the live testimony, violate the Due Process Clause of the Fifth Amendment and Art. III of the United States Constitution.

## A

The guarantees of due process call for a "hearing appropriate to the nature of the case." *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306, 313 (1950). The issue before us, therefore, is whether the nature of the issues presented and the interests implicated in a motion to suppress evidence require that the district court judge must actually hear the challenged testimony. The core of respondent's challenge to the statute is that "[t]he one who decides must hear." *Morgan* v. *United States,* 298 U. S. 468, 481 (1936). Here, he contends, only the magistrate "hears," but the district court is permitted to "decide" by reviewing the record compiled before the magistrate and making a final determination.

In *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976), we emphasized that three factors should be considered in determining whether the flexible concepts of due process have been satisfied: (a) the private interests implicated; (b) the risk of an erroneous determination by reason of the process accorded and the probable value of added procedural safeguards; and (c) the public interest and administrative burdens, including costs that the additional procedures would involve. In providing the fullest measure of due process protection, the Court of Appeals stressed that in this particular case the success or failure of the motion to suppress would, as a practical matter, determine the outcome of the prosecution.

Of course, the resolution of a suppression motion can and

often does determine the outcome of the case; this may be true of various pretrial motions. We have repeatedly pointed out, however, that the interests underlying a voluntariness hearing do not coincide with the criminal law objective of determining guilt or innocence.[4] See, *e. g., United States* v. *Janis,* 428 U. S. 433, 453–454 (1976); *United States* v. *Peltier,* 422 U. S. 531, 535–536, 538–539 (1975); *Rogers* v. *Richmond,* 365 U. S. 534, 540–544 (1961). In *Lego* v. *Twomey,* 404 U. S. 477 (1972), we considered whether the prosecution was required to prove beyond a reasonable doubt that a confession was voluntary. In holding that a preponderance of the evidence was sufficient, we stated that "the purpose that a voluntariness hearing is designed to serve has nothing whatever to do with improving the reliability of jury verdicts." *Id.,* at 486. Accord, *Jackson* v. *Denno,* 378 U. S. 368, 384–385 (1964), holding that the "reliability of a confession has nothing to do with its voluntariness." A defendant who has not prevailed at the suppression hearing remains free to present evidence and argue to—and may persuade—the jury that the confession was not reliable and therefore should be disregarded.[5] See 18 U. S. C. § 3501 (a).[6]

---

[4] Under the Fifth Amendment, a criminal defendant may not be compelled to testify against himself. In that sense, the exclusion of involuntary confessions derives from the Amendment itself. *United States* v. *Janis,* 428 U. S. 433, 443 (1976).

[5] *Lego* v. *Twomey,* 404 U. S. 477 (1972), also rejected the argument that because of the high value society places on the constitutional right to be free from compulsory self-incrimination, due process requires proof of voluntariness beyond a reasonable doubt. This Court found no indication that federal rights would suffer from determining *admissibility* by a preponderance of the evidence.

[6] Nothing in the Magistrates Act or other statute precludes renewal at trial of a motion to suppress evidence even though such motion was denied before trial. A district court's authority to consider anew a suppression motion previously denied is within its sound judicial discretion. See generally *Gouled* v. *United States,* 255 U. S. 298, 312 (1921); *Rouse* v. *United States,* 123 U. S. App. D. C. 348, 359 F. 2d 1014 (1966).

This Court on other occasions has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial. *United States* v. *Matlock,* 415 U. S. 164, 172–174 (1974); *Brinegar* v. *United States,* 338 U. S. 160, 172–174 (1949); Fed. Rules Evid. 104 (a), 1101 (d)(1). Furthermore, although the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, *Roviaro* v. *United States,* 353 U. S. 53, 60–61 (1957), it has never been held to require the disclosure of an informant's identity at a suppression hearing. *McCray* v. *Illinois,* 386 U. S. 300 (1967). We conclude that the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself.

To be sure, courts must always be sensitive to the problems of making credibility determinations on the cold record. More than 100 years ago, Lord Coleridge stated the view of the Privy Council that a retrial should not be conducted by reading the notes of the witnesses' prior testimony:

> "The most careful note must often fail to convey the evidence fully in some of its most important elements. . . . It cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or considera-tion; . . . the dead body of the evidence, without its spirit; which is supplied, when given openly and orally, by the ear and eye of those who receive it." *Queen* v. *Bertrand,* 4 Moo. P. C. N. S. 460, 481, 16 Eng. Rep. 391, 399 (1867).

This admonition was made with reference to an appellate court's review of a *nisi prius* judge in a trial on the merits;

here we are dealing with a situation more comparable to a special master's findings or actions of an administrative tribunal on findings of a hearing officer.

The Court of Appeals rejected an analogy to administrative agency cases because of its view that the interest inherent in a suppression motion was often the equivalent, as a practical matter, of the trial itself. Our view of the due process demands of a motion to suppress evidence makes those agency cases relevant, although to be sure we do not suggest that the interests inherent in administrative adjudications are always equivalent to those implicated in a constitutional challenge to the admissibility of evidence in a criminal case. Generally, the ultimate factfinder in administrative proceedings is a commission or board, and such trier has not heard the witnesses testify. See, e. g., 5 U. S. C. § 557 (general rule under the Administrative Procedure Act); 29 U. S. C. § 160 (c) (National Labor Relations Board); 33 U. S. C. § 921 (b)(3) (Benefits Review Board); 17 CFR § 207.17 (g)(2) (1979) (Securities and Exchange Commission). While the commission or board—or an administrator—may defer to the findings of a hearing officer, that is not compelled. See, e. g., *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474 (1951); *NLRB* v. *Mackay Radio & Tel. Co.,* 304 U. S. 333, 350–351 (1938); *Morgan* v. *United States,* 298 U. S. 468 (1936); *Utica Mutual Ins. Co.* v. *Vincent,* 375 F. 2d 129, 132 (CA2) (Friendly, J.), cert. denied, 389 U. S. 839 (1967).

We conclude that the due process rights claimed here are adequately protected by § 636 (b)(1). While the district court judge alone acts as the ultimate decisionmaker, the statute grants the judge the broad discretion to accept, reject, or modify the magistrate's proposed findings. That broad discretion includes hearing the witnesses live to resolve conflicting credibility claims. Finally, we conclude that the statutory scheme includes sufficient procedures to alert the

district court whether to exercise its discretion to conduct a hearing and view the witnesses itself.[7]

## B

In passing the 1976 amendments to the Federal Magistrates Act, Congress was alert to Art. III values concerning the vesting of decisionmaking power in magistrates.[8] Accordingly, Congress made clear that the district court has plenary discretion whether to authorize a magistrate to hold an evidentiary hearing and that the magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction.

We need not decide whether, as suggested by the Government, Congress could constitutionally have delegated the task of rendering a final decision on a suppression motion to a non-Art. III officer. See *Palmore* v. *United States*, 411 U. S. 389 (1973). Congress has not sought to make any such delegation. Rather, Congress has provided that the magistrate's

---

[7] Neither the statute nor its legislative history reveals any specific consideration of the situation where a district judge after reviewing the record in the process of making a *de novo* "determination" has doubts concerning the credibility findings of the magistrate. The issue is not before us, but we assume it is unlikely that a district judge would *reject* a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach.

[8] The Committee Reports noted several instances prior to the 1976 amendments where Congress had vested in officers of the court, other than the judge, the power to exercise discretion in performing an adjudicatory function, "subject always to ultimate review by a judge of the court," citing 11 U. S. C. § 67 (c) (reference to bankruptcy referee) and 28 U. S. C. § 1920 (power of clerk of court to tax costs). By analogy, Congress reasoned that permitting the exercise of an adjudicatory function by a magistrate, subject to ultimate review by the district court, would also pass constitutional muster. S. Rep., at 6; H. R. Rep., at 8.

proposed findings and recommendations shall be subjected to a *de novo* determination "by the judge who . . . then exercise[s] the ultimate authority to issue an appropriate order." S. Rep., at 3. Moreover, "[t]he authority—and the responsibility—to make an informed, final determination . . . remains with the judge." *Mathews* v. *Weber,* 423 U. S., at 271.

On his Art. III claim, *Crowell* v. *Benson,* 285 U. S. 22 (1932), and its progeny offer little comfort to respondent.[9] There, the Court stated that "[i]n cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function." *Id.,* at 60. See also *Ng Fung Ho* v. *White,* 259 U. S. 276 (1922).[10] While stating that "the enforcement of constitutional rights requires that the Federal court should determine such an issue upon its own record and the facts elicited before it," 285 U. S., at 64, the Court pointedly noted a "distinction of controlling importance" between records formed before administrative agencies and those compiled by officers of the court such as masters in chancery or commissioners in admiralty where the proceeding is "constantly subject to the court's control." We view the statutory scheme here as rendering a magistrate's recommendations

---

[9] In *Crowell,* in reviewing the constitutionality of the delegation of factfinding to administrative officers to consider claims under the Longshoremen's and Harbor Workers' Compensation Act, the Court was concerned that Congress could not reach beyond the constitutional limits which are inherent in the admiralty and maritime jurisdiction. It stated that unless the injuries to which the Act relates occurred upon the navigable waters of the United States, they would fall outside that jurisdiction. 285 U. S., at 55.

[10] The *Crowell* Court rejected a wholesale attack on any delegation of factfinding to the administrative tribunal. It noted that "there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges." *Id.,* at 51–52.

more analogous to a master or a commissioner than to an administrative agency for Art. III purposes.[11]

Moreover, four years later, in *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38 (1936), Mr. Chief Justice Hughes substantially cut back on the Court's *Crowell* holding, which he had authored, and on which respondent relies. The question there was whether administrative rate regulations were unconstitutionally confiscatory. While reaffirming his statement that administrative agencies cannot finally determine "constitutional facts," Mr. Chief Justice Hughes noted:

> "But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings [by an administrative body] upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination." 298 U. S., at 53.

See also *Estep* v. *United States,* 327 U. S. 114, 122–123 (1946). Thus, although the statute permits the district court to give to the magistrate's proposed findings of fact and recommendations "such weight as [their] merit commands and the sound discretion of the judge warrants," *Mathews* v. *Weber, supra,* at 275, that delegation does not violate Art. III so long as the ultimate decision is made by the district court.

We conclude that the statute strikes the proper balance

---

[11] In exercising our original jurisdiction under Art. III, we appoint special masters who may be either Art. III judges or members of the Bar; the role of the master is, for these purposes, analogous to that of a magistrate. The master is generally charged to "take such evidence as may be . . . necessary," *Nebraska* v. *Iowa,* 379 U. S. 996 (1965), and to "find the facts specially and state separately his conclusions of law thereon." *Mississippi* v. *Louisiana,* 346 U. S. 862 (1953). In original cases, as under the Federal Magistrates Act, the master's recommendations are advisory only, yet this Court regularly acts on the basis of the master's report and exceptions thereto.

between the demands of due process and the constraints of Art. III.  Accordingly, the judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Blackmun, concurring.

While I join the Court's opinion, my analysis of the due process issue differs somewhat from that set forth therein, and I write separately to articulate it.  The Court seems to focus on the diminished importance of pretrial suppression motions and the acceptability in some agency proceedings of decision-making without personal observation of witnesses.  For me, these considerations are of less importance than the practical concern for accurate results that is the focus of the Due Process Clause.  In testing the challenged procedure against that criterion, I would distinguish between instances where the district court rejects the credibility-based determination of a magistrate and instances, such as this one, where the court adopts a magistrate's proposed result.[1]

In the latter context, the judge accurately can be described as a "backup" jurist whose review serves to enhance reliability and benefit the defendant.  Respondent was afforded procedures by which a neutral decisionmaker, after seeing and hearing the witnesses, rendered a decision.[2]  After that decisionmaker found against him, respondent received a second

---

[1] This is not to say that a district court's rejection of a magistrate's recommendation in favor of a defendant will inevitably violate the Due Process Clause.

[2] The magistrate, of course, makes only a recommendation, rather than a formal decision.  But, at least in this context, I see no reason to believe that the process of "recommending" is more susceptible to error than "finally deciding."  And even if we were to speculate that some additional risk of error inheres in "recommending," I would conclude that it is more than offset by the doublecheck provided by the district judge and the congressional determination that this procedure permits independent judicial evaluation of suppression motions while conserving scarce judicial resources.

turn, albeit on a cold record, before another neutral decision-maker. In asking us to invalidate the magistrate program, respondent in effect requests removal of the second level of procedural protections afforded him and others like him.[3] In my view, such a result would tend to undermine, rather than augment, accurate decisionmaking. It therefore is not a result I could embrace under the Due Process Clause.

Although MR. JUSTICE MARSHALL ably argues that this characterization of the magistrate procedure clashes with Art. III, I am not persuaded. As the Court observes, the handling of suppression motions invariably remains completely in the control of the federal district court. The judge may initially decline to refer any matter to a magistrate. When a matter is referred, the judge may freely reject the magistrate's recommendation. He may rehear the evidence in whole or in part. He may call for additional findings or otherwise "recommit the matter to the magistrate with instructions." See 28 U. S. C. § 636 (b)(1). Moreover, the magistrate himself is subject to the Art. III judge's control. Magistrates are appointed by district judges, § 631 (a), and subject to removal by them, § 631 (h). In addition, district judges retain plenary authority over when, what, and how many pretrial matters are assigned to magistrates, and "[e]ach district court shall establish rules pursuant to which the magistrates shall discharge their duties." § 636 (b)(4). Thus, the only conceivable danger of a "threat" to the "independence" of the magistrate comes from within, rather than without, the judicial department.

It is also significant that the Magistrates Act imposes significant requirements to ensure competency and impartiality, §§ 631 (b), (c), and (i), 632, 637 (1976 ed. and

---

[3] Certainly respondent does not have a due process right to have an Art. III judge resolve all factual issues surrounding his suppression motion. If he did, virtually every decision on a suppression motion in a state court would violate the Due Process Clause.

Supp. II), including a rule generally barring reduction of salaries of full-time magistrates, § 634 (b). Even assuming that, despite these protections, a controversial matter might be delegated to a magistrate who is susceptible to outside pressures, the district judge—insulated by life tenure and irreducible salary—is waiting in the wings, fully able to correct errors. Under these circumstances, I simply do not perceive the threat to the judicial power or the independence of judicial decisionmaking that underlies Art. III. We do not face a procedure under which "Congress [has] delegate[d] to a non-Art. III judge the authority to make final determinations on issues of fact." *Post,* at 703 (dissenting opinion). Rather, we confront a procedure under which Congress has vested in Art. III judges the discretionary power to delegate certain functions to competent and impartial assistants, while ensuring that the judges retain complete supervisory control over the assistants' activities.

MR. JUSTICE POWELL, concurring in part and dissenting in part.

I agree with the Court's interpretation of the Federal Magistrates Act in Part III of its opinion. The terms and legislative record of § 636 (b)(1) plainly indicate that Congress intended to vest broad discretion in the district courts to decide whether or not to rehear witnesses already heard by a magistrate in a suppression proceeding.

The Court recognizes that "serious questions" would be raised if a district judge rejected a magistrate's proposed findings on credibility. See *ante,* at 681, n. 7. But the Court finds no error in this case, where the District Court accepted the Magistrate's judgment on credibility. I would reach a different conclusion. Under the standards set out in *Mathews v. Eldridge,* 424 U. S. 319, 335 (1976), due process requires a district court to rehear crucial witnesses when, as in this case, a suppression hearing turns *only* on credibility. As MR. JUSTICE MARSHALL points out in his dissenting opinion,

the private interests at stake in a suppression hearing often are substantial. Moreover, the risk of erroneous deprivation of rights is real when a decider of fact has not heard and observed the crucial witnesses. The value of hearing and seeing those witnesses testify is undeniable. Finally, the government interest in limiting rehearing is not sufficient to outweigh these considerations.

In sum, I agree with MR. JUSTICE MARSHALL's statement that, under the Due Process Clause of the Fifth Amendment, a hearing requirement should be imposed

> "only in situations in which the case turns on issues of credibility that cannot be resolved on the basis of a record. . . . If the district judge offered a statement of reasons presenting his independent view of the facts and explaining in some reasoned manner why it was not necessary for him to hear the witnesses in order to adopt that view, it would be an exceptionally rare case in which an abuse of discretion should be found." *Post*, at 701–702.*

I would affirm the judgment of the Court of Appeals on this ground.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

A federal indictment was returned charging the respondent, who had previously been convicted of a felony, with unlawfully receiving a firearm in violation of 18 U. S. C. § 922 (h) (1). Before the trial, the respondent filed in the District Court a motion to suppress various incriminating statements he had made to agents of the Federal Bureau of Alcohol,

---

*The classic situation requiring a hearing *de novo* is when the record of a suppression proceeding contains little beyond a "swearing contest." In many cases, however, the entire record will contain additional evidence—direct or circumstantial—that fully supports the magistrate's recommendation. In those cases, the district court may decide, within its sound discretion, not to hear witnesses.

Tobacco, and Firearms.[1]  Pursuant to the Federal Magistrates Act (Act), 28 U. S. C. § 636 (b)(1),[2] the District Judge referred this motion to a Magistrate, who held an evidentiary hearing and then recommended that the respondent's motion be denied.  Without taking further evidence the District Judge accepted the Magistrate's recommendation and denied

---

[1] The respondent also moved to suppress certain statements the Government claimed he had made to Chicago police officers shortly after his arrest.  At the suppression hearing, the respondent denied having ever made such remarks.  A Chicago police officer testified to the contrary, making the issue one for determination at trial by the trier of fact.

[2] Title 28 U. S. C. § 636 (b)(1) provides:

"Notwithstanding any provision of law to the contrary—

"(A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.  A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

"(B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for postrial [sic] relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

"(C) the magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

"Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.  The judge may also receive further evidence or recommit the matter to the magistrate with instructions."

the motion to suppress. The Court of Appeals reversed, holding that the respondent was constitutionally entitled to a hearing by the judge before his suppression motion could be denied. Today this Court reverses that judgment. I dissent, because I believe that the statute itself required a hearing before the judge in this case.

The statute provides that a district judge, in ruling on a motion to suppress, "shall make a *de novo determination* of those portions of the [magistrate's] report or specified proposed findings or recommendations to which objection is made." 28 U. S. C. § 636 (b)(1) (emphasis added). It is my view that the judge could not make the statutorily required "de novo determination" of the critically contested factual issues in this case without personally observing the demeanor of the witnesses.

At the hearing before the Magistrate the respondent testified that he had made the incriminating statements to the federal agents only because they promised that he would not be prosecuted if he cooperated, and offered to employ him as an informer. The agents gave a different version of the relevant events. They expressly testified that at no time was the respondent ever told that he would not be prosecuted. Instead, according to the agents, he was simply told that any assistance he might provide would be mentioned to the United States Attorney. Their story also undermined the respondent's testimony that he had been offered employment as an informer before he made the incriminating statements.

If the respondent's testimony was true, his motion to suppress evidence of his incriminating statements should have been granted. See *Malloy* v. *Hogan,* 378 U. S. 1, 7; *Bram* v. *United States,* 168 U. S. 532, 542–543. The Magistrate, however, did not believe him, expressly finding that "the testimony of the Alcohol, Tobacco and Firearms agent[s is] more credible" and that the "Federal agents never advised Raddatz that charges against him would be dismissed, if he cooperated." In concluding for this reason that the motion should be denied,

the Magistrate properly exercised the authority granted him by 28 U. S. C. § 636 (b)(1)(B) "to submit . . . proposed findings of fact and recommendations for the disposition" of the suppression motion. But the Act also empowered the respondent to object to these findings. He did so, and the responsibility then devolved on the District Judge to "make a de novo determination" of the contested issues of fact.

The phrase "de novo determination" has an accepted meaning in the law. It means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy. Thus, in *Renegotiation Board* v. *Bannercraft Clothing Co.,* 415 U. S. 1, 23, the Court had occasion to define "de novo proceeding" as a review that was "unfettered by any prejudice from the [prior] agency proceeding and free from any claim that the [agency's] determination is supported by substantial evidence."[3] And, in *United States* v. *First City National Bank,* 386 U. S. 361, 368, this Court observed that "review de novo" means "that the court should make an independent determination of the issues" and should "not . . . give any special weight to the [prior] determination of" the administrative agency.[4]

---

[3] In *Renegotiation Board* v. *Bannercraft Clothing Co.,* the Court was construing the following language in the Renegotiation Act of 1951 as amended:

"Any contractor . . . aggrieved by an order of the Board [of Renegotiation] determining the amount of excessive profits received or accrued by such contractor . . . may—

.        .        .        .        .

file a petition with the Court of Claims for a redetermination thereof. . . . A proceeding before the Court of Claims to finally determine the amount, if any, of excessive profits shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo. . . ." 65 Stat. 21, as amended, 50 U. S. C. App. § 1218.

[4] In *United States* v. *First City National Bank,* the Court was construing 12 U. S. C. § 1828 (c)(7)(A), which provides that in an antitrust action brought under the Bank Merger Act of 1966 the court "shall review de novo the issues presented."

Here, the District Judge was faced with a transcript that contained two irreconcilable accounts of the critical facts. Neither version was intrinsically incredible or, for that matter, less plausible on its face than the other. Moreover, there was in the record no evidence inherently more trustworthy than that supported by human recollection. In these circumstances, the District Judge could not make the statutorily mandated "de novo determination" without being exposed to the one kind of evidence that no written record can ever reveal—the demeanor of the witnesses.[5] In declining to conduct a hearing in this case, the District Judge thus necessarily gave the Magistrate's prior assessment of credibility the kind of "special weight" that the "de novo determination" standard does not permit.

Contrary to the Court's assertion, nothing in the legislative history of the 1976 amendments to the Federal Magistrates Act compels a different conclusion. Congress, to be sure, explicitly rejected a version of the ultimately enacted bill that would have required a district judge always to "hear de novo" those aspects of the case whose proposed resolution by the magistrate dissatisfied one or more of the parties. Compare S. Rep. No. 94–625, p. 2 (1976) (hereinafter S. Rep.) (bill as reported by Senate Committee on the Judiciary), with S. 1283, 94th Cong., 1st Sess. (1975) (bill as originally introduced by Senator Burdick). Moreover, as the Court points out, the Report of the House Judiciary Committee says that "[t]he use of the words 'de novo determination' is not intended to require the judge to actually conduct a new hearing on contested issues." H. R. Rep. No. 94–1609, p. 3 (1976) (hereinafter H. R. Rep.).

---

[5] In other contexts, the Courts of Appeals have held that critical issues of credibility can be resolved only by personally hearing live testimony. See, e. g., *Weahkee* v. *Perry*, 190 U. S. App. D. C. 359, 370, 587 F. 2d 1256, 1267 (1978) (Title VII of Civil Rights Act of 1964); *Hackley* v. *Roudebush*, 171 U. S. App. D. C. 376, 427, and n. 202, 520 F. 2d 108, 159, and n. 202 (1975) (same); *Pignatello* v. *Attorney General*, 350 F. 2d 719, 723–724 (CA2 1965) (Immigration and Nationality Act).

Other passages in the legislative history, however, make clear that these indications of legislative intent comport with the plain language of the statute. As the Senate and House Reports emphasize, "the ultimate adjudicatory power over" suppression and other dispositive motions is to be "exercised by [a district] judge . . . after receiving assistance from and the recommendation of the magistrate." S. Rep., at 10; H. R. Rep., at 11. Thus, according to the House Report, a district judge, "in making the ultimate determination of the matter, would have to give *fresh consideration* to those issues to which specific objection has been made by a party." *Id.*, at 3 (emphasis supplied). The Report describes this responsibility as follows:

> "*Normally,* the judge . . . will consider the record which has been developed before the magistrate and make his own determination on the basis of that record. . . . In some specific instances, however, it may be *necessary* for the judge . . . *to take additional evidence, recall* witnesses. . . ." *Ibid.* (emphasis supplied).

See also 122 Cong. Rec. 35182 (1976) (Rep. Railsback). It is thus evident that Congress anticipated that occasions would arise when a district judge could not make the requisite "de novo determination" without hearing the evidence himself.[6]

Congress' prime objective in 1976 was to overrule this Court's decision in *Wingo* v. *Wedding,* 418 U. S. 461, which had interpreted the then existing Federal Magistrates Act as

---

[6] Nothing in the passage from the opinion of the Court of Appeals in *Campbell* v. *United States District Court,* 501 F. 2d 196, 206–207 (CA9 1974), that is quoted in the House Report can be read to mean anything different. In *Campbell,* the court said that a district court "may, in the exercise of its discretion, call and hear the testimony of a witness or witnesses" when "it finds there is a problem as to the credibility of a witness or witnesses or for other good reasons." Nothing said in *Campbell,* however, implied that a district judge's failure to call a witness or witnesses is invariably permissible.

barring a magistrate from holding an evidentiary hearing on a petition for habeas corpus. See S. Rep., at 3, 9; H. R. Rep., at 5, 11. The 1976 Act thus granted magistrates the power to take evidence on matters like habeas corpus petitions and motions to suppress. By enacting such legislation, Congress obviously anticipated that hearings conducted by magistrates would in many instances obviate the need for district judges to take evidence as well.

It does not follow, however, that Congress told district judges that they need not conduct hearings in every case where an evidentiary hearing has been conducted by a magistrate, regardless of the circumstances. Instead, Congress expressly limited the "clearly erroneous" standard of review to pretrial motions that are termed non-"dispositive" in the Act's legislative history, see S. Rep., at 7, 9–10; H. R. Rep., at 9, 10–11, and excluded habeas corpus petitions, motions to suppress, and other important motions from that category, see 28 U. S. C. § 636 (b)(1).

The Court suggests that a plain reading of the statutory language would, as a practical matter, frustrate the Act's objective of alleviating the increasing congestion of litigation in the district courts. But, as I interpret the statutory language, district judges need not always hold evidentiary hearings in order properly to dispose of suppression motions. Although many motions to suppress turn on issues of credibility, many do not. A suppression motion predicated, for instance, on the claim that a search warrant was not supported by an adequate affidavit could normally be resolved without the taking of any testimony.

More importantly, the "de novo determination" requirement of the Federal Magistrates Act applies to a much wider range of motions and applications than simply pretrial motions to suppress.[7] Some of these—such as motions to dismiss for failure to state a claim, motions for judgment on the pleadings,

---

[7] See n. 2, *supra*.

and motions for summary judgment—presume as a legal matter the lack of any need for an evidentiary hearing, even at the magistrate's level. Others—such as motions for injunctive relief, motions to dismiss or quash an indictment, motions to dismiss or to permit maintenance of a class action, motions to dismiss an action involuntarily, applications for post-trial relief made by those convicted of criminal offenses, and petitions by prisoners challenging conditions of confinement— could often, as a practical matter, be granted or denied by a district court on the strength alone of the transcript of the magistrate's hearing and his recommendation. Thus, contrary to the Court's suggestion, the plain reading I would give to the pertinent statutory language would not equate "de novo determination" with "de novo hearing."

Since I believe that the plain language of the statute required the District Judge in this case to hear the conflicting factual testimony of the witnesses, I would affirm the judgment of the Court of Appeals.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

I agree with my Brother STEWART that the statutory provision for "a de novo determination of . . . specified proposed findings . . . to which objection is made," 28 U. S. C. § 636 (b)(1), should be construed to require the district court to conduct an evidentiary hearing when there are case-dispositive issues of credibility that cannot be resolved on the basis of the record compiled before the magistrate. I write separately to express my view that unless the Act is construed in that fashion, its application in this case is impermissible under the Due Process Clause of the Fifth Amendment and under Art. III.

In my view, the Due Process Clause requires that a judicial officer entrusted with finding the facts in a criminal case must hear the testimony whenever a fair resolution of disputed issues cannot be made on the basis of a review of the cold

record. Accordingly, if the Act permits the district judge not to hear the witnesses, but at the same time requires him to make a *de novo* determination of the facts, its application violates the Due Process Clause in any case that turns on issues of credibility that cannot be resolved on the written record. This infirmity cannot be avoided by interpreting the Act to allow the district judge to give final effect to the magistrate's findings on issues of credibility. Such an interpretation would render the Act fatally inconsistent with Art. III of the Constitution, which entitles a criminal defendant in a federal court to an independent determination of the case-dispositive facts by an Art. III judge.

I

The Court of Appeals held that the unconsented referral of the suppression motion to the Magistrate was not an unlawful delegation of the federal judicial power to a non-Art. III judge. To reach this conclusion, it relied on its understanding that the Act required the District Judge to make a *de novo* determination of all contested issues. At the same time, it concluded that the Due Process Clause required the District Judge to hear the witnesses before making a *de novo* determination of the facts. The Court rejects this conclusion in an analysis suggesting that the individual's interest in vindicating his right against compulsory self-incrimination is an unimportant one. I disagree.

A

One of the most deeply engrained principles in Anglo-American jurisprudence requires that an official entrusted with finding facts must hear the testimony on which his findings will be based. As I explained in *Swisher* v. *Brady,* 438 U. S. 204, 229–233 (1978) (dissenting opinion),[1] our constitutional

---

[1] *Swisher* involved a Maryland procedure whereby a master first made factual findings with respect to the issue of juvenile delinquency, and a judge subsequently conducted a *de novo* review of the evidence. The

tradition rejects the notion that factual findings in criminal cases may be made by an official who acts in isolation and on the basis of a cold record.

The principle that "[t]he one who decides must hear," *Morgan* v. *United States,* 298 U. S. 468, 481 (1936), is supported by two distinct rationales. First, judicial factfinding on the basis of a written record carries an intolerably high risk of error. Any experienced lawyer is aware that findings of fact frequently rest on impressions of demeanor and other factors which do not appear on the face of the record. As the Court stated in *Holiday* v. *Johnston,* 313 U. S. 342, 352 (1941), "[o]ne of the essential elements of the determination of the crucial facts is the weighing and appraising of the testimony." Accordingly, the Court has rejected the proposition "that an appraisal of the truth of the [witness'] oral testimony by a master or commissioner is, in the light of the purpose and object of the proceeding, the equivalent of the judge's own exercise of the function of the trier of the facts." See also *Wingo* v. *Wedding,* 418 U. S. 461 (1974); *United States* v. *Oregon Medical Society,* 343 U. S. 326, 339 (1952); *Dyer* v. *MacDougall,* 201 F. 2d 265, 268–269 (CA2 1952).

The principle is not, however, based solely on the constitutional interest in accurate factfinding. It also derives from the notion that, as a matter of basic fairness, a person facing the prospect of grievous loss is entitled to relate his version of the facts to the official entrusted with judging its accuracy. The Due Process Clause "promot[es] participation and dia-

---

judge's review was confined to the record, with the exception that he could receive additional evidence when the parties did not object. The Court held that the procedure did not violate the Double Jeopardy Clause, but reserved the due process issue on the ground that it was not properly presented. Writing for myself and my Brothers BRENNAN and POWELL, I expressed the view that the issue was before us and that the procedure violated the due process principle that, where demeanor evidence is critical, the ultimate factfinder in a criminal case must hear the witnesses on whose testimony his findings will be based.

logue . . . in the decisionmaking process," *Marshall* v. *Jerrico, Inc.,* 446 U. S. 238, 242 (1980), by ensuring that individuals adversely affected by governmental action may confront the ultimate decisionmaker and thus play some part in formulating the ultimate decision. See *Carey* v. *Piphus,* 435 U. S. 247 (1978); *Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U. S. 78, 103, n. 15 (1978) (MARSHALL, J., concurring in part and dissenting in part).[2] In this respect, the requirement that a finder of facts must hear the testimony offered by those whose liberty is at stake derives from deep-seated notions of fairness and human dignity. See *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 170 (1951) (Frankfurter, J., concurring). A rule that would allow a criminal defendant to face a jail sentence on the basis of factual findings made by one who has not heard the evidence is, in my view, foreign to notions of fair adjudicative procedure embodied in the Due Process Clause.[3]

---

[2] Cf. Michelman, Formal and Associational Aims in Procedural Due Process, in J. Pennock & J. Chapman, Due Process: Nomos XVIII, pp. 126–171 (1977). I do not, of course, mean to suggest that all adverse effects fall within the categories of "life, liberty, [and] property" under the Fifth and Fourteenth Amendments. In recent years the Court has held that those terms encompass only so-called statutory entitlements and certain kinds of grievous losses. See *Vitek* v. *Jones,* 445 U. S. 480 (1980); cf. *PruneYard Shopping Center* v. *Robins, ante,* at 93–94, and n. 2 (MARSHALL, J., concurring).

[3] The principle that deference must be paid to the findings of the official who hears the testimony is reflected in a wide variety of areas of the law. Under Rule 52 of the Federal Rules of Civil Procedure, a trial court's factual findings may be reversed only when "clearly erroneous," a standard that reflects the common understanding that "[f]ace to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth." *United States* v. *Oregon Medical Society,* 343 U. S. 326, 339 (1952). For this reason, the successor of a trial judge who has resigned or died after the conclusion of a trial is ordinarily barred from resolving factual disputes on the basis of the trial transcript. *Brennan* v.

I do not, of course, mean to suggest that a district judge must hear the witnesses in every case, or even in all cases in which issues of credibility are raised. An actual rehearing would be required only in cases involving case-dispositive issues that are impossible to resolve on the basis of the written record. But as my Brother STEWART demonstrates, the District Judge could not make an independent finding in this case without hearing the witnesses. Neither respondent's nor the agents' story carried inherent indicia of reliability. Both accounts suffered from inconsistencies. In the end the issue was solely one of credibility. On the basis of the cold record, the District Judge had no basis for determining whether the respondent or the agents were telling the truth. He was required, therefore, either blindly to accept the Magistrate's findings as to matters of credibility or to flip a coin. The first course is forbidden by the statute and by Art. III; [4] the second is forbidden by the requirements of fair adjudicative procedure that the Due Process Clause reflects.

## B

It is true that the principle that "[t]he one who decides must hear" should not be applied with mechanical rigidity. Administrators are permitted to base factual findings on a record compiled before a hearing examiner who does not play a role in formulating the ultimate findings. See *Morgan* v.

---

*Grisso,* 91 U. S. App. D. C. 101, 198 F. 2d 532 (1952); *United States* v. *Nugent,* 100 F. 2d 215 (CA6 1938), cert. denied, 306 U. S. 648 (1939). And in *United States ex rel. Graham* v. *Mancusi,* 457 F. 2d 463 (CA2 1972) (Friendly, J.), the court applied the principle in habeas corpus proceedings to invalidate a procedure under which a state appellate court had entered a conviction for a lesser offense when reversal of the original conviction was required because of improperly admitted evidence. The court stated: "Due process forbids that, when an issue of fact is presented, a man should be sent to prison without the trier of the facts having seen and heard his accusers and himself, if he desires to testify, and weighing their credibility in the light of their demeanor on the stand." *Id.,* at 469.

[4] See Part II, *infra.*

*United States,* 298 U. S. 468, 481 (1936); 2 K. Davis, Administrative Law Treatise § 11.02 (1958). Similar qualifications of the principle have been recognized by lower courts in certain civil contexts. See, *e. g., Utica Mutual Ins. Co.* v. *Vincent,* 375 F. 2d 129 (CA2), cert. denied, 389 U. S. 839 (1967) (National Labor Relations Board determination of proper unit in a representation election). The Court errs, however, in suggesting that those exceptions provide support for the decision announced today. In a number of the cases in which such exceptions have been permitted, the factual issues to be resolved did not at all depend on issues of credibility; the demeanor of the witnesses was entirely irrelevant. See examples cited *ante,* at 680. And in other cases, the factfinder was not entrusted, as was the District Judge here, with making a *de novo* determination, but was instead permitted to give appropriate deference to the conclusions of the official who conducted the hearing. See 2 K. Davis, *supra,* § 10.04.

I am aware of no case, and the Court cites none, in which a federal court has upheld a procedure in which a judge is required to conduct a *de novo* determination without hearing the witnesses when the factual issues have turned on issues of credibility that cannot be fairly resolved on the basis of the record. Under such a procedure, the judge's determination is so inevitably arbitrary, and so plainly a blind guess, that I believe it to be prohibited by the Due Process Clause under any circumstances. But even if I were not so persuaded, the answer in the present context would be clear, for the simple reason that this case is criminal in nature. It is, of course, in such cases that the need for scrupulous observance of procedural safeguards is greatest. Whatever the appropriate limits of the principle that the factfinder must hear the witnesses where demeanor evidence is critical, the principle is fully applicable to criminal cases.

As the Court correctly observes, see *ante,* at 677, under *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976), the determination of "what process is due" turns on a balancing of three

factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." The Court recites this test, but it does not even attempt to apply it.

Instead, the Court resolves the due process issue solely by distinguishing a motion to suppress evidence from a criminal trial. See *ante*, at 677–681. To state the obvious point that guilt or innocence is not determined in a suppression hearing, however, is only the beginning of the inquiry. That fact does not render the interest of both the defendant and the public in vindicating the right against compulsory self-incrimination an unimportant one, or make it analogous to other interests, such as those involved in a securities transaction, that have been thought to merit comparatively little due process protection, see *ante*, at 680. *Mathews* contemplates and requires a thorough inquiry into the three factors it specifies rather than the conclusory approach taken by the Court today.

The private interests at stake here are hardly insignificant. The suppression hearing was conducted to determine whether the agents had violated respondent's privilege against self-incrimination, an interest that the Constitution singles out for special protection and that our cases recognize as fundamentally important. See, *e. g., Miranda* v. *Arizona,* 384 U. S. 436 (1966). Moreover, respondent's liberty was wholly dependent on whether the trier of fact believed his account of his confession rather than that of the agents. The subsequent history of the case confirms this fact. As my Brother POWELL has explained: "In our criminal justice system as it has developed, suppression hearings often are as important as the trial which may follow. The government's case may turn

upon the confession or other evidence that the defendant seeks to suppress, and the trial court's ruling on such evidence may determine the outcome of the case." *Gannett Co.* v. *De-Pasquale,* 443 U. S. 368, 397, n. 1 (1979) (POWELL, J., concurring). See also *id.,* at 434 (BLACKMUN, J., dissenting in part). Indeed, Congress itself recognized the importance of suppression motions by providing for a *de novo* determination by the district judge.

Second, both the risk of an erroneous deprivation and the probable value of the additional safeguard were substantial. The issues presented here could not be resolved *de novo* solely on the basis of the record. As my Brother STEWART suggests, the case was a classic swearing match: the only issues were ones of credibility. The risk of error could be minimized only if the District Judge heard the witnesses himself.

The Court itself confirms that if the judge does not hear the witnesses his decisions on credibility issues can only be a blind guess, when it intimates that a district judge may not *reject* a magistrate's findings without hearing the witnesses. See *ante,* at 680–681. The sole distinction that can be drawn between accepting the magistrate's findings and rejecting them is that in the former case the district judge is deferring to the magistrate. But the Court rejects this distinction by asserting, in order to avoid the Art. III objection, that in either event it is the district judge who "[makes] the ultimate decision." See *ante,* at 683.

Finally, the governmental interest—essentially one of administrative convenience—is not in this context substantial. The Court of Appeals' holding would not require the district judge to hear the witnesses whenever objection is made to the magistrate's findings. A rehearing requirement would be imposed only in situations in which the case turns on issues of credibility that cannot be resolved on the basis of a record. Nor is there much force to the Government's argument that an occasional rehearing of the witnesses would impose an

intolerable burden on the district courts.[5]   Finally, I would afford the district judge considerable discretion to determine whether a rehearing of the witnesses was required in order for him to make the requisite *de novo* determination.   If the district judge offered a statement of reasons presenting his independent view of the facts and explaining in some reasoned manner why it was not necessary for him to hear the witnesses in order to adopt that view, it would be an exceptionally rare case in which an abuse of discretion should be found.

In this case, it is plain that a *de novo* determination could not be made without hearing the witnesses.   I am therefore brought to the conclusion that the Due Process Clause required the District Judge to rehear the witnesses.   Indeed, a contrary conclusion would suggest that, save for the criminal trial itself, there may be *no* settings in which the principle that "[t]he one who decides must hear" will carry force.

In *Speiser* v. *Randall*, 357 U. S. 513, 520 (1958), we observed that "the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents."   By today's decision, the Court permits the vindication of Fifth Amendment rights to depend on a form of bureaucratic factfinding foreign to our

---

[5] Experience shows that motions to suppress evidence consume a relatively small proportion of the time of federal district judges.   A recent study indicated that suppression motions involving confessions were filed in only 4% of all federal criminal cases.   GAO, Impact of the Exclusionary Rule on Federal Criminal Prosecutions, Report by the Comptroller General of the United States, App. II, p. 8 (Apr. 19, 1979).   Moreover, a rehearing by the district judge would be required only in some of those cases, since the rehearing requirement would be imposed solely in situations (1) involving case-dispositive issues that (2) could not be resolved on the basis of the record and (3) that were contested by a party.   Finally, the rehearing requirement would create an additional burden only where the judge would otherwise choose not to hear the witnesses.   In light of these factors, the incremental expenses that would be imposed by the ruling of the Court of Appeals would be relatively small.

constitutional traditions. I am unwilling to join in that enterprise.

## II

The due process infirmity cannot be remedied by interpreting the statute to permit the district judge to give final effect to the magistrate's findings on issues of credibility. Such an interpretation would render the Act fatally inconsistent with Art. III of the Constitution. The Court attempts to avoid this conclusion by suggesting that the district judge retains "control" of the suppression motion and by indicating that Art. III in any event does not prohibit a federal court from giving final effect to a magistrate's findings of fact. I find neither argument convincing.

### A

At the outset, it is important to observe that the Court's suggestion that "a magistrate's recommendations [are] analogous to [those of] a master or a commissioner," *ante,* at 682–683, is highly misleading. If the motion to suppress turns on issues of credibility that cannot be resolved on the basis of the record, and if the district judge does not hear the witnesses, the magistrate's report is no mere "recommendation." Unless the district judge ventures a blind guess, that report is effectively the final determination of the facts underlying the suppression motion. For this reason, it is simply incorrect to say that the "ultimate decision is made by the district court." *Ante,* at 683. This case squarely presents the issue whether, in a criminal case tried in federal court, Congress may delegate to a non-Art. III judge the authority to make final determinations on issues of fact.

Article III vests the "judicial Power of the United States ... in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." It provides that judges "both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation,

which shall not be diminished during their Continuance in Office."

The rationale underlying the tenure and salary protections of Art. III has often been stated and need not be rehearsed in detail here. But it is worth remembering that the Framers of the Constitution believed that those protections were necessary in order to guarantee that the judicial power of the United States would be placed in a body of judges insulated from majoritarian pressures and thus able to enforce constitutional principles without fear of reprisal or public rebuke. See The Federalist Nos. 78 and 79; *Glidden Co.* v. *Zdanok,* 370 U. S. 530 (1962) (plurality opinion); *O'Donoghue* v. *United States,* 289 U. S. 516, 530 (1933).

In this case it is agreed that magistrates are not Art. III judges. Appointed by the judges of the district court, they serve 8-year terms. They are subject to removal by the judges of the district court for "incompetency, misconduct, neglect of duty, or physical or mental disability." If the Judicial Conference concludes that "the services performed by his office are no longer needed," 28 U. S. C. § 631 (h), a magistrate's office may be terminated. None of these factors, of course, suggests that a magistrate will be unable to perform his assigned tasks fairly and in accordance with constitutional principles. But there can be no doubt that one holding the office of magistrate is unprotected by the safeguards that the Framers regarded as indispensable to assuring the independence of the federal judiciary.

It is true that a number of our decisions have recognized Congress' authority to create legislative tribunals unprotected by the tenure and salary provisions of Art. III. See *Glidden Co.* v. *Zdanok, supra,* at 543–552, and cases cited. Those decisions do not, however, provide any support for the proposition that Congress may, with respect to suppression hearings in criminal cases, displace the federal judiciary and entrust the finding of case-dispositive facts to a non-Art. III tribunal.

The rationale of our decisions involving legislative courts has been far more limited, focusing on Congress' plenary power over specialized areas of geography or subject matter and on the manifest need for a more flexible tribunal to perform adjudicatory functions in those areas. See generally 370 U. S., at 543–552. Nor has the Court suggested that it will defer blindly to a congressional determination that an alternative tribunal is necessary. "The touchstone of decision in all these cases has been the need to exercise the jurisdiction then and there and for a transitory period. Whether constitutional limitations on the exercise of judicial power have been held inapplicable has depended on the particular local setting, the practical necessities, and the possible alternatives." *Id.*, at 547–548. Thus "the requirements of Art. III, *which are applicable where laws of national applicability and affairs of national concern are at stake,* must in proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment." *Palmore* v. *United States,* 411 U. S. 389, 407–408 (1973) (emphasis added). Congress has never attempted to displace Art. III courts when laws of nationwide applicability were involved, and nothing in our prior decisions suggests that it may constitutionally do so.[6]

---

[6] The Government contends that since Congress is constitutionally entitled not to create federal courts, see *Palmore* v. *United States,* 411 U. S. 389 (1973); *Sheldon* v. *Sill,* 8 How. 441 (1850), and may instead entrust the resolution of federal questions to state courts, it follows that Congress also has the authority to create federal tribunals that do not carry the safeguards of Art. III. Such a view would, of course, render the requirements of Art. III practically meaningless by permitting Congress to vest the judicial power in whatever tribunal it chose.

The argument is unpersuasive for two additional reasons. First, it represents a revival of the now discredited idea that Congress may attach whatever conditions it wishes to entities or programs that it is free not to create. Cf. *Vitek* v. *Jones,* 445 U. S., at 487–494. But there is no logical infirmity in concluding that although Congress is free not to create

Our decision in *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955), confirms that there are severe limits on Congress' authority to displace Art. III courts. In that case the Government attempted to try a civilian ex-serviceman in a military tribunal. The Court agreed that Congress' authority under Art. I, § 8, cl. 14, "To make Rules for the Government and Regulation of the land and naval Forces" permitted it to subject persons in the Armed Services to trial by court-martial. Nonetheless, it concluded that the clause should not be construed to encompass civilian ex-servicemen. Such a construction, the Court held, "necessarily encroaches on the jurisdiction of federal courts set up under Article III of the Constitution." *Id.,* at 15. The Court emphasized that "[t]he provisions of Article III were designed to give judges maximum freedom from possible coercion or influence by the executive or legislative branches of the Government." *Id.,* at 16. Accordingly, Congress' power to circumvent criminal trials in Art. III tribunals would not "be inferred through the Necessary and Proper Clause," but would instead call "for limitation to 'the least possible power adequate to the end

federal courts, if it chooses to do so, those courts must be as described in Art. III, subject to limited exceptions.

Second, the argument misconceives the intentions that underlay the constitutional compromise embodied in Art. III. The Framers were especially concerned about the possibility of an alliance between federal judges and the Congress. For this reason, they ensured that federal judges would be isolated from the legislative branch of the Federal Government and protected from congressional reprisal. State courts were perceived as necessarily independent from the Federal Government and as a relatively reliable buffer against its excesses. No such assurance would be possible with respect to federal judges unprotected by the provisions of Art. III. It follows from those assumptions that under Art. III, Congress is generally prohibited from creating specially accountable federal tribunals but at the same time is permitted to entrust issues of federal law to state tribunals. See generally Tushnet, Invitation to a Wedding: Some Thoughts on Article III and a Problem of Statutory Interpretation, 60 Iowa L. Rev. 937, 944–945 (1975); cf. R. Berger, Congress v. The Supreme Court 8, 117–119 (1969).

proposed,' " *id.,* at 22–23 (emphasis omitted), quoting *Anderson* v. *Dunn,* 6 Wheat. 204, 231 (1821). The *Quarles* decision has been applied in other contexts to limit sharply Congress' power to try civilians in Art. I courts. See *Reid* v. *Covert,* 354 U. S. 1 (1957) (civilian dependents living with servicemen on military base may not be tried in Art. I court); *O'Callahan* v. *Parker,* 395 U. S. 258 (1969) (crimes that are not service connected may not be tried in Art. I court). In my view, *Quarles* and its progeny foreclose the conclusion that Congress may use its Art. I powers to create legislative tribunals in order to divest Art. III courts of their authority to conduct federal criminal proceedings.

## B

As the Court observes, see *ante,* at 681, Congress has not in this case attempted to substitute magistrates for Art. III judges on a wholesale basis. The district court retains authority over questions of law. Under the Court's construction, it is also compelled to make a *de novo* determination of the facts, to the extent that that task can be performed on the basis of an evidentiary record. Reasoning by analogy from the context of masters and commissioners, the Court suggests that the retained power of the district court is sufficient to satisfy the requirements of Art. III. As I have explained, however, when a district judge does not hear the witnesses, it is the magistrate who makes the final determination of factual questions in any case involving issues of credibility that cannot be resolved on the basis of the record. The Court's conclusion must therefore rest on an understanding that the requirements of Art. III are fully applicable when the issues are ones of law, but not when the issues are factual in nature. See *ante,* at 683. I am unable to discern any such distinction in Art. III or in any other provision of the Constitution.

As the Court rightly observes, the primary case relevant to the question is *Crowell* v. *Benson,* 285 U. S. 22 (1932). There the Court upheld the constitutionality of an administrative

scheme by which deputy commissioners adjudicated compensation claims under the Longshoremen's and Harbor Workers' Compensation Act, but at the same time ruled that the federal district court must find *de novo* whether a master-servant relationship existed and whether the injury occurred on the navigable waters of the United States. Mr. Chief Justice Hughes, speaking for the Court, did rely on the "historic practice" of permitting the courts to be assisted in factual findings by masters and commissioners, *id.,* at 51. But the Court's opinion in *Crowell* provides no authority for the statutory scheme upheld today.

The Court in *Crowell* expressly rejected the proposition that Congress had authority to displace the federal judiciary by removing all questions of fact from Art. III courts. "In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function." *Id.,* at 60. The Court's reasoning on this point bears quotation in full:

> "[T]he question is not the ordinary one as to the propriety of provision for administrative determinations. . . . It is rather a question of the appropriate maintenance of the Federal judicial power in requiring the observance of constitutional restrictions. It is the question whether the Congress may substitute for constitutional courts, in which the judicial power of the United States is vested, an administrative agency . . . for the final determination of the existence of the facts upon which the enforcement of the constitutional rights of the citizen depend. The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use, and that the Congress could com-

pletely oust the courts of all determinations of fact by vesting the authority to make them with finality in its own instrumentalities or in the Executive Department. That would be to sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts becomes in effect finality in law." *Id.,* at 56–57.

The Court relied on *Ng Fung Ho* v. *White,* 259 U. S. 276 (1922), where it held that persons involved in deportation proceedings and claiming to be citizens of the United States are constitutionally entitled to a *de novo* judicial determination of their factual claims. "[W]hen fundamental rights are in question, this Court has repeatedly emphasized 'the difference in security of judicial over administrative action.'" *Crowell* v. *Benson, supra,* at 61, quoting *Ng Fung Ho* v. *White, supra,* at 285. In this respect, the Court found that its earlier discussion of the historical use of masters and commissioners was irrelevant, for even as to factual issues "their reports are essentially advisory, a distinction of controlling importance when questions of a fundamental character are in issue." *Crowell* v. *Benson, supra,* at 61.

In his celebrated dissent, Mr. Justice Brandeis rejected the view that the particular factual issues in *Crowell* were ones that must constitutionally be resolved *de novo* in an Art. III court. He did agree, however, that there are some issues of fact which must be found independently in an Art. III court. "[U]nder certain circumstances," he stated, "the constitutional requirement of due process is a requirement of judicial process." 285 U. S., at 87. As he explained in a subsequent opinion: "A citizen who claims that his liberty is being infringed is entitled, upon habeas corpus, to the opportunity of *a judicial determination of the facts.* And, so highly is this liberty prized, that the opportunity must be accorded to any

resident of the United States who claims to be a citizen."
*St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 77
(1936) (concurring opinion) (emphasis added).[7]

It may fairly be said that in certain respects at least, Mr.
Justice Brandeis' views in *Crowell* and *St. Joseph Stock Yards*
have become the law. It can no longer be claimed that a per-
son is entitled under Art. III or the Due Process Clause to a
*de novo* judicial determination of the facts in every case that
implicates constitutional rights. Yet neither *Crowell* nor *Ng
Fung Ho* has been overruled, and the Court has cited both
with approval in recent years. See *Agosto* v. *INS,* 436 U. S.
748, 753 (1978); *Atlas Roofing Co.* v. *Occupational Safety
and Health Review Comm'n,* 430 U. S. 442, 450, n. 7 (1977).
Cf. *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 118 (1976)
(REHNQUIST, J., dissenting); *Paris Adult Theatre I* v. *Slaton,*
413 U. S. 49, 102, and n. 20 (1973) (BRENNAN, J., dissenting).[8]

---

[7] Federal courts on habeas corpus are not obliged to examine the facts
independently in every case. Under *Townsend* v. *Sain,* 372 U. S. 293
(1963), deference to the state-court findings is permitted in the absence
of any allegation of procedural irregularity. As the holdings of *Ng Fung
Ho* and *Crowell* make clear, however, this deference is based on the special
role played by state courts in the federal system, and not on any rule
allowing Congress to create non-Art. III tribunals to make findings of fact
that are binding on Art. III courts. See n. 6, *supra.*

[8] In *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 53 (1936),
the Court indicated that, in the context of a claim of unconstitutional
confiscation, the requirement of independent judicial judgment would be
satisfied even if the court gives "the weight which may properly attach to
findings [by an administrative body] upon hearing and evidence." In
subsequent cases the Court has made clear that the scope of judicial review
of confiscation claims may be limited to the substantial-evidence test. See
*FPC* v. *National Gas Pipeline Co.,* 315 U. S. 575 (1942); *FPC* v. *Hope
Natural Gas Co.,* 320 U. S. 591 (1944); *Alabama Public Service Comm'n*
v. *Southern R. Co.,* 341 U. S. 341, 348 (1951); *American Trucking
Assns.* v. *United States,* 344 U. S. 298 (1953). See generally 4 K. Davis,
Administrative Law Treatise § 29.09 (1958). But the Court errs if it reads
*St. Joseph Stock Yards* to establish the far more radical proposition that
*all* questions of fact may be transferred to and decided by non-Art. III

There is no basis, then, for a conclusion that there are *no* circumstances in which a person is entitled to a determination of the facts by an Art. III court. In my view, both Mr. Chief Justice Hughes and Mr. Justice Brandeis were correct on one of the few propositions on which they were in agreement in *Crowell:* that there remain some cases in which an opportunity for an independent judicial determination of the facts is constitutionally required.

The Court's conclusion to the contrary appears premised on its perception that, under the Act, effective control of suppression motions remains in the hands of district judges, and the submission of "recommendations" by magistrates is a relatively mechanical task for which the special characteristics of an Art. III judge are unnecessary. But in view of the likely finality of the magistrate's decision and the importance of fact-finding to the process of legal decision, that view is unsupportable. As I have explained, in cases like this one the magistrate's decision is effectively unreviewable if the district judge does not hear the witnesses. The fact that the judge is permitted to hear the witnesses is an irrelevance in any case in which he does not do so. Moreover, the Court has emphasized that the vindication of constitutional rights more frequently depends on findings of fact than abstract principles of law. See *Speiser* v. *Randall,* 357 U. S., at 520. And it cannot seriously be suggested that the majoritarian pressures the Framers sought to avoid by the tenure and salary protections of Art. III become inapplicable when the relevant question is one of fact. Indeed, it is precisely in resolving constitutional issues that are dependent on questions of credibility as between a government official and one accused of crime that a detached and independent arbiter may be most indispensable. A contrary conclusion would mean that the

federal tribunals. See *ante,* at 683. Our continued adherence to *Ng Fung Ho* v. *White,* 259 U. S. 276 (1922), demonstrates that such a reading would be unwarranted.

protections of Art. III, viewed as so fundamental by the Framers of the Constitution, were intended to apply solely to appellate judges.

### C

Since I reject the suggestion that every issue of fact may be removed from Art. III courts and submitted instead to federal magistrates, the question remains whether a suppression hearing is one of the admittedly few contexts in which independent factfinding by an Art. III judge is constitutionally required. I believe that it is.

As noted above, Mr. Justice Brandeis would have restricted the requirement of independent judicial factfinding to situations in which personal liberty was at stake, such as habeas corpus and deportation. I agree that for both criminal cases and deportation, a citizen is constitutionally entitled to an independent determination of the case-dispositive facts by an Art. III court. My conclusion is based on two factors, the nature of the issue and the individual interest in a determination by an Art. III judge.[9] Resolution of the issues involved in criminal cases and deportation proceedings does not require specialization or expertise in an area in which a federal judge is untrained. Moreover, the Framers adopted Art. III precisely in order to protect individual interests of the sort involved here.[10] In my view, the independence provided by

---

[9] See L. Jaffe, Judicial Control of Administrative Action 640–648 (1965). In my view, this standard is far preferable to a test that would draw a rigid line between issues of law and issues of fact, and hold that, with the exception of the criminal trial, the latter need never be resolved independently by an Art. III court. No such line appears in the Constitution, and it is contradicted by the rationale that underlies the tenure and salary protections of Art. III.

[10] Alexander Hamilton justified the tenure and salary protections of Art. III in this fashion:

"That inflexible and uniform adherence to the rights of the constitution, and of individuals, which we perceive to be indispensable in the courts of justice, can certainly not be expected from judges who hold their offices by

Art. III is hardly dispensable in finding facts underlying a motion to suppress evidence on Fifth Amendment grounds. Nor, for these purposes, is it possible to distinguish between suppression motions and the trial itself; as experience shows, the primary issues in a criminal case often deal with whether evidence should be excluded because illegally obtained. I am therefore brought to the conclusion that the Constitution entitled respondent to an independent judicial determination of the facts on which his motion to suppress was based.[11]

## III

The Court's holding today is undoubtedly influenced by its sympathy with Congress' perception that the assistance of federal magistrates was a necessary measure to ensure that the already severe pressures on the federal district courts do not become overwhelming. I too sympathize with that concern. And I applaud the conspicuous and conscientious legislative effort to conform to the dictates of the Constitution by ensuring maximum control of suppression motions by the federal district courts. I agree with my Brother STEWART that § 636

---

a temporary commission. Periodical appointments, however regulated, or by whomsoever made, would, in some way or other, be fatal to their necessary independence. . . .

"Next to permanency in office, nothing can contribute more to the independence of the judges, than a fixed provision for their support. . . . In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.*" The Federalist No. 78, p. 489, and No. 79, p. 491 (Gideon ed. 1818) (emphasis in original).

[11] Actual rehearing of the witnesses, of course, would be required only in exceptional cases. In most circumstances the requirement of independent judicial factfinding would be satisfied on the basis of record review. It is only when that task cannot fairly be performed in the absence of the witnesses that a *de novo* hearing should be required. And as I have indicated, see *supra,* at 701–702, if the district judge offered a statement of reasons explaining why it was not necessary for him to hear the witnesses, an abuse of discretion would be found quite rarely. See n. 5, *supra; ante,* at 693–694 (STEWART, J., dissenting).

(b)(1) should be construed to avoid the constitutional objections and to require the district court to call witnesses when a fair resolution of the facts is not otherwise possible.

The Court's unwillingness to construe the relevant provision in this fashion may be attributable to an understandable desire to minimize existing burdens on federal district judges, burdens that may seem especially unnecessary with respect to the gathering and evaluation of the facts. But the replacement of Art. III judges with magistrates, even if the replacement extends only to the finding of facts, erodes principles that strike near the heart of the constitutional order. In such contexts considerations of administrative cost are least forceful, and the Court must be most wary lest principles that were meant to endure be sacrificed to expediency. I would affirm the decision of the Court of Appeals.