Phillip S. NEWELL, Plaintiff,

v.

Secretary of Commerce, Malcolm BALDRIDGE; United States Department of Commerce; National Oceanic and Atmospheric Administration; National Marine Fisheries Service; and United States of America, Defendants.

No. C81–133R.

United States District Court,
W. D. Washington.

July 20, 1982.

Louis D. Peterson, Wendy W. Reed, Seattle, for plaintiff.

Christine McKenna Moore, Asst. U. S. Atty., Seattle, Wash., James C. Kilbourne, Dept. of Justice, Land & Natural Resources, Washington, D. C., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, District Judge.

THIS MATTER comes before the court upon the defendants' motion for summary judgment on their counterclaim and against plaintiff, Phillip S. Newell, on the claim set forth in his complaint. Newell's complaint sets forth an appeal from administrative proceedings. Having reviewed the motion, memoranda of counsel, and the administrative record, the court finds and rules as follows:

### I. BACKGROUND

Phillip S. Newell is president of Far East Aquatic Imports, Inc. (hereinafter Far East Imports). Counts VIII and X through XXII are directed at actions taken by Far East Imports. Before forming Far East Imports, Newell conducted business as Seattle Aquatic Supply. His business as Seattle Aquatic Supply forms the basis for Counts I through IV.

Newell imports tropical fish from various Asian exporters and distributes them to

dealers in the United States. Typically, Newell would receive telephone calls from United States dealers who wished to order fish from a price list which he had distributed to them. The dealers would identify the desired fish by a code number contained on the price list. If a dealer wished to order sea turtles, he would identify them by code number "103". If a dealer wished to order pantherfish, he would identify them by code number "60". At the end of each week, Newell consolidated all the orders and telexed them to the respective Asian exporters. One of his exporters was A. T. Viri, who was located in Manila, Philippines. Newell's dealings with Viri are the basis of this case. When Viri received a telex from Newell, he packaged the fish for each dealer in individual boxes, crated the boxes, and air freighted them to Honolulu, Hawaii. Newell employed a subcontractor in Honolulu who received the shipments and cleared them through United States customs. The subcontractor then broke down the larger shipments and forwarded them directly to the ultimate consignee.

The National Marine Fisheries Division of the National Oceanic and Atmospheric Administration (NOAA) began its investigation of Newell after Agent Severtson was contacted by the Seattle Aquarium to assist in the donation of a sea turtle on March 7, 1977. The agent determined that the donor possessed a Hawksbill sea turtle, which is on the Endangered Species List. 50 C.F.R. § 17.11.

Agent Severtson conducted an investigation into the origin of the Hawksbill sea turtle, which eventually led him to Richard MacDuff, the owner of Aquatics Unlimited, a wholesale tropical fish company. MacDuff informed Severtson that he ordered sea turtles from Newell, using the code number "103" for the turtles from Newell's price list. When he received sea turtles from Newell, however, they were never labeled as such, instead being identified as "Pantherfish (For 103)."

MacDuff agreed to arrange a controlled buy of sea turtles for Agent Severtson. While in Severtson's presence, MacDuff telephoned Newell and ordered ten sea turtles for delivery the following Monday, April 11, 1977. On Monday, the sea turtles arrived at the Seattle airport in a box from A. T. Viri addressed to Aquatics Unlimited. The outside of the box identified the contents as pantherfish, but the box contained ten Pacific Ridley sea turtles.

On December 13, 1978, NOAA issued Newell a Notice of Violation pursuant to 50 C.F.R. § 218.11, charging him with seven counts (for three separate transactions)[1] of violating the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* (ESA) by illegally importing, selling and delivering three Hawksbill sea turtles in interstate commerce. The Notice also charged Newell with fifteen counts of violating the Lacey Act, 18 U.S.C. §§ 43–44, by transporting sea turtles in foreign commerce which were improperly labeled as pantherfish. NOAA issued its Notice of Final Assessment on March 14, 1979, finding that Newell had committed the violations as charged and assessing him a total civil penalty of $11,000 which represented an assessment of $500 for each of the 22 counts.

Newell requested an administrative hearing pursuant to 50 C.F.R. § 218.15 to challenge the penalty assessment. A one-day hearing was held before Administrative Law Judge (ALJ) Hugh J. Dolan. Based upon a stipulation of facts, the evidence presented at the hearing and the pre- and post-hearing memoranda submitted by the parties, ALJ Dolan found that Newell had committed the violations as alleged. The ALJ also concluded that the penalty initially assessed was "grossly inadequate", and he increased the penalty to $90,000, which represented $10,000 for each of the three

---

1. Apart from the Hawksbill sea turtle involved in the Seattle Aquarium donation described above, Newell's records showed that on August 3, 1967 shipment of six sea turtles from Viri contained a Hawksbill. Exh. 17–V. Newell stipulated that in October and December 1975, he shipped orders of sea turtles from Washington State to a dealer in Montana. Exh. 17–0–1. One of the sea turtles in each of those shipments was also an endangered Hawksbill sea turtle. Exh. 17–0–1 to 17–0–2, 17–P–1 to 17–P–2.

transactions which formed the basis for the seven ESA violations and $4,000 for each of the fifteen Lacey Act violations.

Newell then requested and was granted an appeal before an appeals board. On January 5, 1981, the appeals board issued its opinion. It dismissed Counts V–VII and IX (four of the Lacey Act violations) because it concluded NOAA had failed to prove those shipments actually contained sea turtles rather than pantherfish. As to the eleven other Lacey Act violations, however, the appeals board held that the government had proven Newell knew the shipments of sea turtles were mislabeled as pantherfish. The board also held NOAA had proven Newell knew or should have known that he was importing Hawksbill sea turtles. The board reduced the amount of the penalties to $1,000 for each of the eleven Lacey Act violations and $4,000 for each of the three transactions constituting the ESA violations, for a total of $23,000. The appeals board decision constituted the final agency action concerning the penalty assessments.

## II. ENDANGERED SPECIES ACT VIO-LATIONS

■ The parties agree that the standard of judicial review requires the court to uphold the agency's action if it is supported by substantial evidence. The standard is enunciated in Section 11(a) of the ESA, 16 U.S.C. § 1540(a)(1), which provides that if any person against whom a civil penalty has been assessed fails to pay the penalty when due, the Secretary may request the Attorney General to institute a civil action to collect the penalty. Here, Newell filed a complaint seeking judicial review of the Secretary's action, and the Secretary then counterclaimed for collection of the penalty. The applicable judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), imposes the same substantial evidence test as does the above section of the ESA. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *RSR Corp. v. FTC,* 602 F.2d 1317, 1320 (9th Cir. 1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980).

Newell was assessed civil penalties by the Secretary for three violations of the 1973 version of the ESA, 16 U.S.C. § 1540(a)(1) which provides:

> Any person who knowingly violates, *or who knowingly commits an act in the course of a commercial activity which violates,* any provision of this chapter . . ., may be assessed a civil penalty by the Secretary of not more than $10,000 for each violation.

(emphasis added). Newell has not disputed that he had imported, sold or delivered the three Hawksbill sea turtles. He argues that the government failed to prove that he had *knowingly* committed a violation of the ESA, that is, that he knew that the turtles were an endangered species. The government contends that § 1540(a)(1) imposed strict liability upon commercial operators. Newell responds that the provision cannot be construed to impose strict liability on commercial operators for any volitional act, however innocent or unavoidable, that happens to result in the importation, sale or delivery of an endangered species.

■ The court does not construe the 1973 ESA as imposing strict liability upon commercial operators for totally innocent conduct. Both the language of the statute and its legislative history, however, make it clear that commercial operators were held to a higher standard than others. Having done acts which violated the ESA, Newell failed to refute the government's substantial evidence that he knew or should have known that the turtles were an endangered species.

The application of a stricter standard to commercial operators has been consistent throughout the history of the ESA. In 1969, when the ESA was passed by Congress, its enforcement provisions were contrasted with those of the amended Lacey Act:

> Unlike paragraph 4(a)(1) [§ 1540(a)(1) of the ESA], however, violations punishable under this subsection [of the Lacey Act] must be knowing (or knowing, in the exercise of due care). The reason for this

different treatment can be explained by a comparison of the types of persons who are likely to be in violation of these different provisions. Section 4 deals with importers who should have complete control over the merchandise which they order and subsequently receive in this country.

S.Rep.No.91–526, 91st Cong., 1st Sess. (1969), *reprinted in* 1969 U.S.Code Cong. & Ad.News 1413, 1425. In 1973 Congress amended the enforcement provision of the ESA. The Conference Report stated:

> The conferees developed new language subjecting *knowing or commercial* violators to the full $10,000 penalty where specified offenses were proven.

(emphasis added). H.Conf.Rep.No.93–740, 93d Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.Code Cong. & Ad.News 2989, 3006.

The 1978 amendments to the ESA (not controlling here) made clear that commercial operators were strictly liable. The legislative history indicates that changes of language were meant to clarify rather than change the standard.

> Both the Senate and the House amended section 11 of the act, the penalties and enforcement section in order to alleviate certain enforcement ambiguities of the act . . . .
>
> The amendment reduces the strict liability penalty for others than importers and exporters to $500, makes criminal violations of the act a general rather than a specific intent crime and subjects importers and exporters of fish and wildlife and plants to strict liability penalties of up to $10,000 . . . The conferees emphasize that the strict liability provision which applies to persons engaged in the business as an importer or exporter of fish, . . . . does not apply to commercial fishing operations . . . .

H.Conf.Rep.No.95–1804, 95th Cong., 2d Sess. 26 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 9453, 9493.

Newell insists that the record contains no evidence that he knew Hawksbill sea turtles had been transported or sold, or that he purposely sought to remain ignorant of that fact. The court finds evidence to support both propositions. Newell points to the following evidence: Customers ordered "sea turtles" by code number without specifying species. Tr. at 134. Newell would then place a consolidated order with its supplier using the same general code number without specifying species. Tr. at 143, 148; Exs. 17–V–1, W–1, Y–2, BB–3, CC–2, EE–2. There is no evidence that Newell ever ordered Hawksbill sea turtles or that any ever passed into his hands. Tr. at 89, 148, 23, 139.

The following evidence demonstrates Newell's actual knowledge. At his first encounter with Agent Severtson, Newell admitted that "to his knowledge, all species of marine sea turtles were endangered and prohibited to import or sell . . . and that, because of that understanding, that all of them were endangered, that he did not actively participate in the business of sea turtles." Tr. at 64. He also told Severtson that because they were illegal he would ask his customers not to order sea turtles. Tr. at 94. Despite his belief, Newell personally took orders for sea turtles, including specific orders for turtles that were "light colored on the bottom and dark on the top", fitting the description of Hawksbill sea turtles. Tr. at 125–27. One of Newell's purchasers identified Hawksbill turtles as the variety he told Newell he preferred to receive. Tr. at 19–22, 126. At the hearing Newell testified that during 1976 he was aware of no limitations on sea turtle imports. Tr. at 147. ALJ Dolan disbelieved his testimony. Ex. 22 at 15–18. Newell also testified that at an unspecified date he became confused whether importation of sea turtles was legal or illegal. Tr. at 147. Newell also testified that he was a member of a trade association which disseminates information to its members on endangered species. Tr. at 152–54.

There is substantial evidence to support the Secretary's decision. *Simeon Management Corp. v. FTC,* 579 F.2d 1137, 1142 (9th Cir. 1978). The court's review of the record establishes the soundness of the findings at each stage of the administrative proceedings.

## III. LACEY ACT VIOLATIONS

On November 16, 1981, Congress repealed the Lacey Act, 18 U.S.C. §§ 43–44, and replaced it with the Lacey Act Amendments, 16 U.S.C. §§ 3371–3378. The standard of district court review remains the same. The court has "authority to review the violation and the assessment of the civil penalty de novo." 16 U.S.C. § 3373(c). The legislative history of 16 U.S.C. § 3373(c) specifies the type of review Congress intended:

In providing for de novo review by the district court of alleged violations and civil penalty assessments, the Committee does not intend to require a de novo presentation of the evidence. A decision as to whether review will be based upon the administrative record or will be based upon a partial or complete representation of the evidence in district court is within the discretion of the district court judge . . . .

Such decisions should be made on a case-by-case basis.

S.Rep.No.97–123, 97th Cong., 1st Sess. 11 (1981), *reprinted in* 1981 U.S.Code Cong. & Ad.News 1748, 1758. *See also, United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Redmond v. United States*, 507 F.2d 1007 (5th Cir. 1975).

Newell readily agrees with the foregoing, but offers various reasons why this court should hear live testimony: He cites the fact that the penalties assessed against him are very severe. He also claims that because this review is in the posture of a counterclaim by the government, the burden on the government is higher.

▪ Where there is uncertainty about the facts in the record before the court, a de novo hearing should be had. In the court's opinion, Newell presents no reason for it to hear live testimony. There is no assertion that Newell did not have a full opportunity to present his case at the administrative proceedings, nor does Newell even suggest that any of the testimony that he would offer to this court would differ from that which was offered below. The only dispute about the facts on the record is how to interpret them. The court will limit itself to a de novo review of the administrative record.

The next question disputed by the parties is whether the evidence on the record proves that Newell knowingly violated the Lacey Act. Newell states that the applicable provision requires the government to prove that Newell knew or *should have known the facts* that allegedly resulted in violations of the Act. (emphasis added). *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).

The Lacey Act provided for the imposition of civil or criminal penalties against:

(a) Any person who

(1) delivers, carries, transports, or ships, by any means whatever, or causes to be delivered, carried, transported, or shipped for commercial or noncommercial purposes or sells or causes to be sold any wildlife taken, transported, or sold in any manner *in violation of any Act of Congress* or regulation issued thereunder, . . .

(emphasis added). 18 U.S.C. § 43(a)(1) [Now, 16 U.S.C. § 3372(a)(1)]. The Act of Congress which Newell was charged with violating was 18 U.S.C. § 44, which made it unlawful to:

Ship[ ], transport[ ], carr[y], bring[ ] or convey[ ] in interstate or foreign commerce any package containing any . . . reptile . . . without plainly marking, labeling, or tagging such package with the names and addresses of the shipper and consignee and with an accurate statement showing the contents by number and kind . . . .

According to Newell, because he did not directly handle the imported sea turtles, he could not have known that they were mislabeled. Most of his arguments may be reduced to a general allegation that the blame rests on A. T. Viri. According to Newell, Viri was solely responsible for listing the type and quantity of each species on the shipment invoices. Tr. at 139. Newell argues that there was no evidence to prove

that Newell knew Viri was mislabeling sea turtles as pantherfish. Tr. at 143. Furthermore, Newell contends even after Newell's conversation with MacDuff, when he was informed that Viri had labeled sea turtles as pantherfish, he had no reason to suspect that Viri continued to mislabel shipments.

The government points to evidence in the record which the court finds to be substantial, that Newell knew or should have known that the sea turtles he was ordering were being labeled as pantherfish. The general ordering system has already been outlined. Illustrative of Newell's role is Exh. 17–CC. On December 10, 1976, Newell placed a telex order with Viri stating "Aquatics Unltd ... /1032/." The code number "103" was for sea turtles and the "2" was the quantity. Despite the fact that no pantherfish were included in this telex order, both the "A.T. Viri & Co., Inc., Export Sales Invoice," and the "Department of Interior Declaration" show two "pantherfish" going to Aquatics Unlimited in this shipment. No sea turtles are listed on the Export Sales Invoice or the Declaration. The Far East Imports invoice, a copy of which Newell received, shows two "pantherfish (103)". No sea turtles are listed on the invoice by common name, although the "(103)" after "pantherfish" was Newell's stock code number for sea turtles.

Richard MacDuff, proprietor of Aquatics Unlimited testified before the ALJ that he received about eight shipments of sea turtles mislabeled as just described. After the first shipment he telephoned Newell to tell him of the mislabeling. Newell told him that the mislabeling was done so that the turtles could be exported efficiently from the Philippines. Tr. at 16–19. Another of Newell's purchasers offered similar testimony. Tr. at 42–46. When the government made its controlled buy from Newell through Aquatics Unlimited on April 10, 1977, the same method of mislabeling was used. Tr. at 60–62.

When government agents went to Newell's place of business, he had been warned by telex from his agent in Honolulu that the shipment had been discovered Tr. at 63. When asked for his records, Newell led the investigators to a room which did not contain his Viri files. Tr. at 64. The Viri files were revealed only after a specific request to see them was made. *Id.* Again, Newell told the investigators that the boxes were falsely labeled to avoid export laws in the Philippines. Tr. at 65. The government introduced over 100 documents into evidence which established the fact of mislabeling. Most of the documents were taken from Newell's own files. Exhs. 17–Q to 17–FF. Substantial evidence in the record supports the findings below that Newell knew or should have known of the mislabeling of the shipments of sea turtles.

## IV. PENALTIES

Newell also raises the issue of whether the penalties for violations of the ESA and the Lacey Act are justified. Newell has been found to have violated the Lacey Act, 18 U.S.C. § 43, which provides for a penalty of up to $5,000 for the transportation or sale of wildlife in violation of *any act* of Congress. The act of Congress which Newell violated was 18 U.S.C. § 44.

> Whoever ships, transports, carries, brings or conveys in interstate or foreign commerce any package containing any ... amphibian, or reptile, ... without plainly marking, labeling, or tagging such package with the names and addresses of the shipper and consignee and with an accurate statement showing the contents by number and kind;
>
> .   .   .   .   .
>
> Shall be fined not more than $500 or imprisoned not more than six months, or both; and the shipment shall be forfeited.

Newell argues that a more particular statute will control where a general and a particular statute are both applicable to a specific subject. He also asserts that rules of statutory construction favor a mild penalty over a harsh one.

According to Newell, the 1981 Lacey Act Amendments confirm his interpretation that the § 44 penalty provision governs the

**46**

instant case. Section 3 of the Amendments, 16 U.S.C. § 3372, defines two categories of offenses relating to the import, export, sale, etc. of wildlife. Offenses other than marking offenses arising under any law or regulation allow a civil penalty of up to $10,000 per violation. 16 U.S.C. § 3373(a)(1). For the more particular offense of mismarking or mislabeling defined in the statute, a lesser penalty not to exceed $250 per violation is provided. 16 U.S.C. § 3373(a)(2). Marking offenses are expressly excluded from the penalty provisions applicable to the general class of non-marking offenses.

The legislative history of the Lacey Act Amendments establish that the lesser penalty is not applicable to Newell's violations:

> Because the marking regulations are intended to provide a regulatory tool, the penalty for *simple, unintentional clerical violations* of the regulations should be limited.

(emphasis added). S.Rep.No.97–123, 97th Cong., 1st Sess. 9, (1981), *reprinted in* 1981 U.S.Code Cong. & Ad.News 1756.

 ALJ Dolan found that Newell participated in a "deliberate, continuous false labeling scheme" which reflected "a most aggravated series of commercial activities". Exh. 22 at 19. Newell "knew the facts of what was transpiring, and actively induced them to occur". Exh. 22 at 15. The court agrees with the government that, considering the magnitude of Newell's importing business, the administrative findings of Newell's participation in a continuous, multiviolation mislabeling scheme, and the vital public interest in deterring illegal trade in wildlife, the $1,000 penalty assessment for each violation clearly is warranted.

Similar reasoning supports an affirmance of the assessments under the ESA. 16 U.S.C. § 1540(a)(1) imposes a maximum civil penalty of $10,000 for each violation of the ESA by a commercial operator. The appeals board assessed Newell $4,000 for each of the three Hawksbill sea turtle violations. Newell argues that the assessment penalty against him is unwarranted because it is unduly disproportionate to the gravity of the violations and varies excessively from the penalties assessed in similar cases. He also claims that the penalties are unwar-

ranted in law because the evidence in the record fails to establish a knowing violation of the ESA. This last argument has already been rejected.

 The appeals board lowered the penalties assessed under the ESA by the ALJ. It considered the responsibilities which the ESA places on commercial dealers, the purposes of the Act, the number of turtles involved, the fact that this was the first enforcement action against Newell, and Newell's complicity and intent. It also considered NOAA's civil penalty schedule, the penalties initially assessed in the case, and the penalties assessed in other civil penalty cases. Exh. 32 at 5. The court finds that the penalties assessed against Newell under the ESA are entirely justified.

IT IS ORDERED that the defendants' motion for summary judgment against Phillip Newell for $23,000, which represents the total penalty assessed for both the ESA and Lacey Act violations, is GRANTED, and the complaint is dismissed with prejudice.