**Sabil M. MUJAHID, Petitioner,**

v.

**Joseph H. CRABTREE, Warden, FCI, Sheridan, Respondent.**

**No. CV–97–1661–AS.**

United States District Court, D. Oregon.

April 8, 1998.

Christopher J. Schatz, Federal Public Defender's Office, Portland, OR, for Petitioner.

Kenneth C. Bauman, Asst. U.S. Atty's Office, Portland, OR, for Respondent.

## OPINION AND ORDER

ASHMANSKAS, United States Magistrate Judge.

Petitioner Sabil M. Mujahid, an inmate at FCI Sheridan, brings this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241. Respondent has moved to dismiss. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c).

## *BACKGROUND*

On September 29, 1995, in the District of Alaska, petitioner was sentenced to a term of 120 months imprisonment, to be followed by a term of three years of supervised release. The court also imposed a $1500.00 fine and a special assessment of $50.00. In its written Judgment In A Criminal Case ("Judgment"), the district court directed that $50 of this obligation was due immediately, with the balance to be paid "in installments to commence 30 day(s) after the date of this judgment." Judgment (Respondent's Answer, Ex. A, p.

14.) The form of judgment listed two alternatives that were not selected by the court. The first would have required the entire sum to be paid by a date certain. The second alternative would have established a schedule of fixed payments at specified intervals. *Id.*

The Judgment also provided that:

In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. probation officer shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate . . .

\* \* \* \* \* \*

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments are to be made to the United States Courts National Fine Center . . . except those payments made through the Bureau of Prison's Inmate Financial Responsibility Program. If the National Fine Center is not operating in this district, all criminal monetary penalty payments are to be made as directed by the court, the probation officer, or the United States attorney.

*Id.*

Following imposition of sentence, the Bureau of Prisons ("BOP") sent petitioner to reside at the federal correctional institution at Sheridan, Oregon. Shortly after arriving at FCI Sheridan, petitioner was given the option of "voluntarily" enlisting in the Inmate Financial Responsibility Program ("IFRP") or else suffering a long list of sanctions.

If petitioner enlisted in the program, the BOP would take funds from his prison account and apply them toward the outstanding balance on his fine, fee assessment, and any other obligations of petitioner including court costs, court-ordered restitution, "[s]tate or local court obligations" or "[o]ther federal government obligations." 28 C.F.R. § 545.11. These latter categories seemingly include anything from child support obli-

gations to defaulted student loans or income taxes.

The regulations fix the minimum "payment" at $25.00 per quarter, but the BOP may unilaterally increase that amount. 28 C.F.R. § 545.11(b)(1). If petitioner was assigned grades 1 through 4 in UNICOR (the jobs program at the prison), the BOP would take "not less than 50%" of his monthly pay and could unilaterally increase that amount. 28 C.F.R. § 545.11(b)(2). The regulations allow the BOP to demand "payment" from both "institution resources" (*e.g.*, funds obtained from prison employment) as well as "non-institution resources" which include any funds that petitioner receives from sources such as his family. 28 C.F.R. § 545.11(b). The regulation is worded broadly enough that it may also allow the BOP to demand payment from any assets petitioner has outside of prison.

Technically, participation in the program is "voluntary" and the BOP cannot take any assets or funds unless petitioner assents to that transaction. However, petitioner faces sanctions if he does not "volunteer" to participate in this program, or make "voluntary" payments in an amount to be determined by the BOP, or "consent" to the BOP's unilateral decision to increase the amount of those required payments. The consequences of refusing to "volunteer" are clearly spelled out in 28 C.F.R. § 545.11(d):

(d) Effects of non-participation. Refusal by an inmate to participate in the financial responsibility program or to comply with the provisions of his financial plan ordinarily shall result in the following:

(1) Where applicable, the Parole Commission will be notified of the inmate's failure to participate;

(2) The inmate will not receive any furlough (other than possibly an emergency furlough);

(3) The inmate will not receive performance pay above the maintenance pay level, or bonus pay, or vacation pay;

(4) The inmate will not be assigned to any work detail outside the secure perimeter of the facility;

(5) The inmate will not be placed in UNICOR. Any inmate assigned to UNICOR who fails to make adequate progress on his/her financial plan will be removed from UNICOR, and once removed, may not be placed on a UNICOR waiting list for six months. Any exceptions to this require approval of the Warden;

(6) The inmate will not be permitted to purchase any items in excess of the monthly spending limitation, including special purchase items like sports equipment, hobby crafts, etc.;

(7) The inmate will be quartered in the lowest housing status (dormitory, double bunking, etc.);

(8) The inmate will not be placed in a community-based program;

(9) The inmate will not receive a release gratuity unless approved by the Warden.

(10) [Reserved]

(11) The inmate will not receive an incentive for participation in residential drug treatment programs.[1]

Petitioner refused to enroll in the IFRP program, or agree to make the payments required of participants in that program, because the obligation imposed "did not conform to my understanding as to what I had been ordered to pay by the Alaska District Court" and because "it was my understanding that, were I to agree to participate in the IFRP, the amount to be paid toward my fine would be set by BOP personnel and that the amount set could be increased above the installment payment amount established by the judgment in my case" which petitioner believes to be "$12.91 per month over the term of my incarceration." Mujahid Decl., ¶ 3.

The petition, which was filed *pro se*, asks that respondent "be enjoined [from] acting as a collection agency for the court in setting [the] time, conditions and amounts of petitioner's payments of fine and manner thereof, i.e., lump sum or by installments through policy statement § 5380.1 and/or title 28 C.F.R. § 545.10 or § 545.11."

---

**1.** The "incentive" is apparently an earlier release from prison. Declaration of Sabil M. Mujahid in Support of Petition for Writ of Habeas Corpus ("Mujahid Decl."), ¶ 4.

Petitioner's argument is further developed in a subsequent memorandum filed after counsel was appointed to represent him. The essence of petitioner's claim is that decisions such as the amount of the installments that he should pay and their timing is a core judicial function that, under Article III, are committed to the courts and cannot be delegated to nonjudicial officers such as the BOP. Consequently, the BOP is overstepping its constitutional authority by purporting to make such decisions and by sanctioning inmates for resisting its unlawful directives. Finally, petitioner contends that respondent's actions are interfering with the installment payment schedule established by the Alaska District Court.

## DISCUSSION

### 1. § 2255 or § 2241

■ If petitioner was challenging the terms of his sentence, the proper vehicle would be a 28 U.S.C. § 2255 petition filed in the District of Alaska where he was sentenced. However, as I read this petition, he is merely contesting the manner in which his sentence is being carried out, or asserting that the BOP has taken action inconsistent with the terms of that sentence and in excess of its authority. Therefore, this petition was properly filed in this District, where petitioner is incarcerated, pursuant to 28 U.S.C. § 2241.

### 2. Mootness, Ripeness, Standing

Respondent argues that this challenge is moot because petitioner has refused to participate in the program. I disagree. At the outset, I question respondent's characterization of the question as one of mootness. Instead, the thrust of respondent's argument appears to be that petitioner lacks standing or that the issue is not ripe. I reject both arguments.

■ To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing,

a plaintiff must, generally speaking, demonstrate that:

(1) he or she has suffered (or is about to suffer) an "injury in fact": an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;

(2) there must be a causal connection between the injury and the conduct complained of: the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and

(3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ As a consequence of his refusal to enroll in the IFRP, petitioner has been subject to the list of sanctions[2] described 28 C.F.R. § 545.11(d). Not every sanction on the list has actually been applied to him (since, for instance, he has not yet been released and thus has not had the opportunity to have his release gratuity withheld). However, it is undisputed that at least some of these sanctions have already been applied, *e.g.*, petitioner was assigned to the lowest level of housing and was denied employment in the UNICOR program, and that the other listed sanctions will, as a matter of course, be applied to him unless he alters his conduct in the manner that the BOP demands. It also is undisputed that the sanctions imposed are directly attributable to petitioner's refusal to enroll in the IFRP, thus satisfying the causation element of standing. Finally, a favorable ruling from this court would redress petitioner's alleged injury. I conclude that petitioner has standing, and the issue is ripe for review and has not been mooted.

### 3. Exhaustion of Administrative Remedies

■ Exhaustion of administrative remedies would be a futile exercise. The petition

---

**2.** I reject respondent's Orwellian efforts to characterize these sanctions by a more benign euphemism, *e.g.*, a failure to receive privileges. If we expect inmates to behave honestly and responsibly—which ostensibly is the purpose of the IFRP—then we must begin by being honest with them: "These are the standards of conduct that we expect you to uphold, and the consequences if you fail to do so."

raises only issues of law upon which respondent has already articulated its position (which, in turn, is mandated by BOP regulations.) Respondent could not deviate from those regulations even if it wanted to. Nor is there any need to further develop the factual record.

### 4. *Conflict with Sentence*

■ Petitioner contends the IFRP requirement that he pay at least $25.00 per quarter toward his fine violates the sentencing judge's mandate that he pay only $12.91 per month toward that fine. There are two obvious flaws in that argument. First, $25.00 per quarter is less than $12.91 per month, not more. Second, the sentencing judge did not say anything about the amount of each monthly installment, or even establish a deadline by which the obligation must be paid. On the contrary, the sentencing judge conspicuously declined to do so even though the form of judgment used provided a space for that very purpose if the judge had so desired. The figure of "$12.91" appears to have been computed by dividing the obligation due by the length of the sentence, but this court is not aware of any authority that endorses (let alone requires) this methodology.

The Judgment does provide that the U.S. Probation office "shall request the court to establish a payment schedule if appropriate," but that section is modified by the words, "In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision ..." Consequently, I do not interpret this Judgment to mean that only the court may establish a payment schedule for the period during which petitioner is in the custody of the BOP. In addition, the Judgment expressly provides that payments are due during the period of imprisonment and in the same paragraph specifically mentions the IFRP.

There is no direct conflict between the terms of petitioner's sentence and the BOP's demands for payment.

### 5. *Usurpation of Judicial Authority*

■ Petitioner also contends that, by asserting the right to determine the time and amount of payments toward his fine and imposing sanctions for non-compliance, the BOP has unlawfully usurped core judicial powers that can be exercised only by an Article III judge.

Petitioner's argument rests upon cases from other circuits which hold that a sentencing judge may not delegate to a probation officer or other non-judicial officials (*i.e.,* persons other than judges) the power to determine the timing or amount of installment payments for monetary penalties the court had imposed such as fines and restitution. Some of those decisions were premised upon the court's interpretation of the specific statute, while others held that such a delegation violates Article III of the United States Constitution; a few did not clearly articulate the basis for the decision. *Cf United States v. Johnson,* 48 F.3d 806 (4th Cir.1995) (violation of Article III); *United States v. Graham,* 72 F.3d 352 (3d Cir.1995) (interpretation of 18 U.S.C. § 3663(a)); *United States v. Ahmad,* 2 F.3d 245 (7th Cir.1993) (same); *United States v. Porter,* 41 F.3d 68 (2d Cir.1994) (basis not clearly articulated); *United States v. Albro,* 32 F.3d 173 (5th Cir.1994) (same). Some courts have found no violation so long as the district court retains final authority to resolve any disputes. *United States v. Lilly,* 80 F.3d 24 (1st Cir.1996).

A handful of cases have expressly applied this judicial non-delegation doctrine in the context of the IFRP. *United States v. Mortimer,* 94 F.3d 89 (2d Cir.1996) held that the BOP could not lawfully exercise the judicial responsibility of establishing a payment schedule for court-imposed monetary penalties, reasoning that this amounted to an improper delegation of core Article III judicial functions that could be exercised only by the district court. *Id.* 94 F.3d at 90–91.[3] *Accord United States v. Miller,* 77 F.3d 71 (4th Cir.1996).

In this District, Judge Panner recently rejected a similar challenge to the IFRP,

---

**3.** The Second Circuit had previously upheld the IFRP, although the challenge in that case was on

other grounds. *Johnpoll v. Thornburgh,* 898 F.2d 849, 851 (2d Cir.1990).

noting that in two prior cases the Ninth Circuit has held that so long as the district court sets the maximum amount of restitution it may delegate authority for devising a payment plan to the probation office. *Hensel v. Crabtree,* CV 97–1234–PA (DOr March 18, 1998) (citing *United States v. Barany,* 884 F.2d 1255, 1257 (9th Cir.1989) and *United States v. Signori,* 844 F.2d 635, 637 (9th Cir.1988)). While these Ninth Circuit decisions did not specifically address the IFRP, Judge Panner concluded that the circumstances were sufficiently analogous to demonstrate the Ninth Circuit's position on this issue. *Id.*

This court agrees with Judge Panner's well-reasoned opinion and adopts its analysis, with one small caveat. The issue in both *Barany* and *Signori* was statutory construction, *i.e.,* whether the statute requiring restitution allows the district court to delegate to the probation office authority to determine the timing and manner of those payments. However, as the Supreme Court recently reminded us, interpreting the statute is only the first hurdle; there remains the question of whether the statute, as interpreted, is constitutional. *Cf. Feltner v. Columbia Pictures Television, Inc.,* —— U.S. ——, 118 S.Ct. 1279, 140 L.Ed.2d 438, (1998) (interpreting statute as requiring court rather than jury to establish amount of statutory damages in copyright action, but then declaring that the statute as interpreted violates the Seventh Amendment right to a jury trial). Petitioner challenges not just the interpretation of the relevant statutes and regulations, but also their constitutionality. The latter issue was not addressed by *Barany* and *Signori,* hence those decisions are not controlling here.

The debate concerning this judicial non-delegation doctrine is in many respects similar to that which erupted when Congress began delegating responsibility to administrative agencies. While early cases took a dim view of such delegations, *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241,

79 L.Ed. 446 (1935), the Court has now come to accept that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).[4]

On occasion, the Supreme Court has applied a version of the non-delegation doctrine in the judicial context, though sometimes couching the decision in terms of separation of powers. *See, e.g., United States v. Raddatz,* 447 U.S. 667, 683, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (approving use of Magistrate Judges "so long as the ultimate decision is made by the district court"); *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 76–87, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (finding Bankruptcy Act of 1978 unconstitutional because "essential attributes of the judicial power" were not retained in an Article III court).

This court concludes that collection activities, and establishing and modifying a payment schedule for criminal monetary penalties, are not "essential attributes of the judicial power" that may be exercised only by the district court. Nor, in this court's opinion, would it be practical for the district courts to be burdened with such responsibilities.

A district court judge who has been on the bench for any length of time has sentenced hundreds, if not thousands, of defendants. It is unreasonable to expect the district court to decide how much each of those defendants can afford to pay in a given month. "I see you just got a 50 cent an hour raise, so I will increase your monthly payment." "Perhaps you could pay more if you reduced your clothing and entertainment expenditures by $20." "Since your child was sick, you had a doctor's bill to pay, and you missed two days from work to stay home with her, I'll let you skip this month's payment."

The Courts of Appeals that have endorsed this modern non-delegation doctrine aren't

---

4.  Admittedly, Congressional delegations of power are accompanied by some safeguards: Congress may countermand the agency's regulation by enacting new legislation, the Administrative Procedures Act imposes some constraints and order upon the rulemaking and adjudication process, and there is an opportunity for notice and comment and for judicial review (albeit under a very deferential standard). Similar safeguards are not present here, but the court does not find them to be essential in the present context.

faced with the task of implementing such a scheme. Judges at the trial level who will be in the line of fire may have a very different perspective. *See, e.g., United States v. Golino,* 956 F.Supp. 359 (E.D.N.Y.1997) (on remand, exploring various unpalatable options for implementing the decision by the Court of Appeals).

In theory, the day-to-day task of establishing and modifying an installment payment plan, and related collection activities, might be delegated to a non-judicial officer, with the court retaining ultimate authority to resolve any dispute. *See, e.g., Lilly,* 80 F.3d at 29. *Cf Raddatz,* 447 U.S. at 683, *Northern Pipe Line,* 458 U.S. at 76–87. However, even that limited role could easily consume a substantial quantum of judicial and staff resources with little offsetting benefits.

Such a task also exceeds the degree of involvement or control that the district court retains in analogous circumstances. Once a defendant is sentenced to prison, with limited exceptions the court does not decide the institution at which he will be housed, whether he will be transferred, the level of security, what he will eat for breakfast or numerous other conditions of confinement. Such matters are decided by the BOP. Nor does the district court decide whether an inmate should be granted parole (for those still subject to that system). That is the job of the Parole Commission. Once the district court enters a judgment establishing that the individual shall be incarcerated, and the maximum (and sometimes minimum) duration thereof, thereafter it has little involvement in the case unless asked to revoke parole or supervised release.

Similarly, once a money judgment in a civil case has been entered, the district court does not typically supervise efforts to collect that judgment. Such matters are handled through garnishments of wages or accounts, liens, and similar techniques. Likewise, unless the facts require otherwise, the judgment is usually for a lump sum, not for installment payments of a specified amount on a given date. The district court does not concern itself with how much the defendant can afford to pay and when.

In the instant case, the District Court entered a judgment providing for the incarceration of petitioner for a specified duration, a term of supervised release, and other terms and conditions. The judgment also established that petitioner owes, and is required to pay, certain sums to the United States. This court sees no reason why the judge who imposed the sentence must now oversee the government's efforts to collect that judgment, particularly to the point of deciding how much petitioner can afford to contribute each month toward his obligation. Nor does this court see any reason why the government cannot impose sanctions against petitioner if he declines to make such payments. Such a rule would be news to the IRS and other agencies that routinely employ coercive measures to collect money owed to the government.

### CONCLUSION

This petition raises interesting questions that eventually will be decided by the Ninth Circuit. For now, the court declines to enjoin respondent from implementing the IFRP. The court also finds no conflict between the IFRP and the terms of the sentence imposed upon petitioner. Accordingly, respondent's motion to dismiss (docket # 14–2) is granted, the petition (# 2) for writ of *habeas corpus* is denied, and this action is dismissed.