**UNITED STATES of America, Plaintiff,**

v.

**A.C.P. (Male Juvenile), Defendant.**

**No. CR 04–159PG.**

United States District Court, D. Puerto Rico.

June 7, 2005.

Nathan Joseph Schulte, United States Attorney's Office, San Juan, PR, for Plaintiff.

Héctor E. Guzmán–Silva, Federal Public Defender's Office, Hato Rey, PR, for Defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court is Magistrate Judge Gustavo A. Gelpi's Sealed Report and Recommendation ("R & R") (Docket No. 103) regarding the government's motion to transfer juvenile A.C.P. to adult status. (Docket No. 12.) Upon reviewing the R & R, the objections, the applicable case law, the record, as well as the particular circumstances surrounding this juvenile's case, the Court concurs with the Magistrate Judge's assessment of the same and accordingly adopt his recommendation.

## BACKGROUND

On April 7, 2004, A.C.P was arrested by federal agents. The following day the government filed the charging information and five days later moved to transfer A.C.P. to adult status pursuant to 18 U.S.C. § 5032. The matter was referred to Magistrate Judge Gelpi on April 16, 2004.

Since April 2004, A.C.P. has been detained in a juvenile institution and has provided substantial cooperation to federal authorities, resulting in several convictions. As the Magistrate Judge adequately illustrated, the Speedy Trial Act clock was tolled by A.C.P.'s repeated requests for continuances and waiver of Speedy Trial Act rights in order to obtain the best possible outcome of his plea agreement in light of his uninterrupted and effective cooperation with the government. (*See* Docket No. 103 at 2–4.)

Following several procedural events, A.C.P. finally requested that his transfer hearing be reopened. The hearing resumed on April 11, 2005. On April 28, the Magistrate Judge issued the R & R and gave the parties five days to file any objections. The government timely objected, (Docket No. 108), and defendant responded. (Docket No. 110.)

## DISCUSSION

### I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B), Local Rule 72, and Local Criminal Rule 157.1; a District Court may refer dispositive motions to a U.S. Magistrate Judge for a Report and Recommendation. The adversely affected party may contest the Magistrate Judge's findings by timely filing objections. *See* Local Rule 72(d). If

objections are filed, the District Judge shall make a de novo determination of those portions of the report to which [an] objection is made. *Id.* Failure to timely file specific objections waives the right to review by the District Court, and waives the right to appeal the District Court's order. *See U.S. v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *see also U.S. v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424(1980).

## II. TRANSFER OF JUVENILE TO ADULT STATUS

■■■ Upon the government's motion, a district court may transfer a juvenile if it finds, after a hearing, that such transfer "would be in the interest of justice," in light of six specific factors set forth in 18 U.S.C. § 5032. *U.S. v. Female Juvenile, A.F.S.,* 377 F.3d 27, 32 (1st Cir.2004). In assessing whether transfer is warranted the district court must consider evidence, and make findings in the record, of the following factors:

> the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; [and] the availability of programs designed to treat the juvenile's behavioral problems.

18 U.S.C.A. § 5032. The court "need not find that each factor weighs in favor of transfer in order to grant the Government's motion." *U.S. v. Male Juvenile E.L.C.,* 396 F.3d 458, 461 (1st Cir.2005). In fact, the court "need not even find that a majority of factors weigh in favor of the prevailing party, inasmuch as it is not required to give equal weight to each factor." *Id.* (internal quotations omitted). Instead, the Court may balance the factors as it deems appropriate. *See id.* (collecting cases). "The analytical balancing of the transfer factors cannot be expressed mathematically." *Id.* at 462. The District Court's findings regarding the transfer factors are reviewed for abuse of discretion, but the "findings of fact underlying the transfer decision are reviewed under the clearly erroneous standard." *U.S. v. Smith,* 178 F.3d 22, 26 (1st Cir.1999).

■■■ There is a statutory presumption in favor of juvenile proceedings. *Female Juvenile, A.F.S.,* 377 F.3d at 32. Indeed, the underlying purpose of the federal juvenile delinquency process is to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *Id.* (*quoting United States v. Brian N.,* 900 F.2d 218, 220 (10th Cir.1990)) (citations omitted). District courts "must balance these important interests against 'the need to protect the public from violent and dangerous individuals.'" *Male Juvenile E.L.C.,* 396 F.3d at 461 (*quoting United States v. Juvenile Male # 1,* 47 F.3d 68, 71 (2d Cir.1995)). The decision on whether to transfer "a young individual to adult status ... is in most instances a difficult one as it can have severe consequences for a juvenile's rehabilitation." *Male Juvenile E.L.C.,* 396 F.3d at 461.

## III. ANALYSIS OF THE TRANSFER FACTORS

■■■ Following an in-depth analysis of the six factors and with the benefit of a comprehensive hearing, the Magistrate Judge concluded that A.C.P. should not be transferred. Although the nature of the offense itself weighed heavily in favor of transfer, the Magistrate Judge determined that the combination of his lack of prior juvenile record and cooperation with the government weighed heavily in favor of

maintaining his juvenile status. Ultimately, he concluded that the coupling of factors tilted the balance in favor of keeping A.C.P.'s juvenile status. The Magistrate Judge felt compelled to depart from the jurisprudential consensus in cases involving armed robbery in light of the uniqueness of A.C.P.'s case and the extraordinary rehabilitative efforts he has demonstrated throughout the year following his arrest. *Cf. Smith*, 178 F.3d at 26 (citing cases finding no abuse of discretion regarding proper balancing of statutory factors including every published case where juvenile was transferred for the crime of armed robbery).

The government raises several objections to the Magistrate Judge's analysis of the underlying facts regarding some of the transfer factors[1]. Particularly, the government stresses that the character and nature of the offense in and of itself warrants transferring A.C.P. to adult status. The bulk of the evidence regarding A.C.P.'s extraordinary rehabilitation efforts and achievements, however, overshadows any consideration in support of transfer.

The government objects, for example, to the Magistrate Judge's findings regarding the age and background factor[2] arguing that A.C.P. committed the offenses even with the benefit of being raised by family members, and that the family has supported him throughout the process of this case.

A review of the photographs of the house in which A.C.P. lived with his mother right before his arrest, however, demonstrates her complete lack of care and abandonment of her filial duties. Indeed, the Magistrate Judge concluded A.C.P. was living in deplorable conditions. The pictures show an inhumane neglect to the basic sanitary and essential needs of A.C.P. and anyone else living there. (*See* defendant's Exhibits A–M). (*See also* Docket No. 56 at 96–99, Federal Public Defender Investigator Margaret Lynn's descriptions of the house and its conditions). Furthermore, although defendant has continued to receive the love and support of his father, which he had until the latter moved out of the house, his mother has not been that supportive. Specifically, Social Worker Ivelisse Gomez, who works at the juvenile detention center A.D.C. has been housed at since his arrest, testified during the transfer hearing that his mother did not visit him as regularly as his father did which A.D.C. resented. (*See* Docket No. 56 at 43.) She further testified that A.D.C. had written her letters but she had not answered them. She mentioned, for example, that in one letter he had sent her he wrote "You have forgotten that you have a son in jail." (*Id.*) Another event worth mentioning is that A.C.P.'s father testified that when the juvenile returned from Chicago with a bullet wound in one of his legs, his mother, who picked

1. The government did not raise objections to the Magistrate Judge's findings regarding the nature of past treatment efforts and juvenile's response to such efforts, as well as the extent and nature of the juvenile's prior delinquency record factors. Upon reviewing the Magistrate Judge's conclusions regarding these factors, the Court adopts his recommendations.

2. The Magistrate Judge made the following findings regarding A.C.P.'s age and social background: He was born on August 31, 1986. At the time of the offense at issue, he was almost seventeen and half years old. The record shows his parents divorced when he was about four years old. A.C.P. had lived with his mother for about a year, and with an aunt in Chicago. He completed the ninth grade but had failed the tenth grade. While living in Chicago, he was expelled from school and was sent back to Puerto Rico. At the time of his arrest he was living with his mother and siblings in dreadful conditions.

him up, did not take him to receive medical help and claimed she had intended to do so the next day. When the father finally saw A.C.P. the day after his arrival, he noticed his injury and immediately took him to a hospital. (Docket No. 56 at 73.)

Though poverty and lack of care cannot excuse a person's choice to commit a crime, the Court simply cannot ignore the fact that A.C.P. did not receive from his mother adequate guidance and attention. His father may have given him advice, but he was not the custodial parent. The mother's disregard for A.C.P.'s basic necessities made him a susceptible target for unscrupulous adults seeking children in need of care, to lure them into their lucrative criminal activities, and shield themselves from criminal responsibility, which in fact seems to have been the case with A.C.P. (*See* Docket Nos. 31 at 11; and 56 at 41.)

The government insists, however, that regarding A.C.P.'s present intellectual development and psychological maturity factor, he has failed to express feelings of guilt toward the victim. The government overlooks, however, that although A.C.P. did not specifically use the word "guilt" he did state he regrets his actions and has shown remorse. He has expressed to his counselors and to Dr. Margarida Juliá that he feels repent for his terrible actions which is also evidenced by his cooperation with law enforcement authorities. At the transfer hearing, he testified that he felt bad because he had no business shooting anybody and that he was no one to take someone's life. He further stated he had learned to appreciate and value life. (Docket No. 95 at 83–84.) In other words, A.C.P.'s time at the juvenile detention center has allowed him to reevaluate his goals, his life, and learn to think before acting. (*See* Docket No. 95 at 83–84.) Indeed, once he began receiving treatment at the detention center, A.C.P. achieved great progress in his intellectual development and psychological maturity [3].

Another objection raised pertains to the availability of programs designed to treat the juvenile's behavioral problems. The government argues that to accomplish A.C.P.'s rehabilitation goals, as recommended by Dr. Juliá [4], A.C.P. should be transferred to a designated federal facility that offers vocational programs and courses to obtain a GED ("Grade Equivalency Degree"). Furthermore, that be-

---

**3.** The Magistrate Judge found that at the time of his initial neuropsychological evaluation by Dr. Julia, on May 4, 2004, approximately a month following his arrest, A.C.P.'s intelligence testing revealed he had a borderline intellectual functioning level when compared to individuals of his age. (*See* Docket No. 31 at 6–7.) His performance on standard intelligence tests as well as in more specialized neuropsychological tests tapping verbal fluency and verbal communication, expression, and abstraction, revealed borderline to low average results. (Id. at 9.) There was always evidence of impairment in the comprehension of social norms and social judgment. The tests administered to A.C.P. indicated that his cognitive flexibility and ability to change plans, and organize problem solving strategies was severely impaired. Defendant also demonstrated a consistent patter of brain dys-

function associated with the ability to learn new verbal information. His clinical profile further showed that he suffered from depression and that his delinquent behavior may be the result of passively following more dominant peers or other individuals. (*Id.* at 11.) In Dr. Julia's second evaluation, she noted that as a result of his rehabilitation at the juvenile institution, A.C.P. improved in most of his neuropsychological areas, including his maturity, remorse, recognition of his strengths and frailties, and increased motivation for therapy. (*See* Docket Nos. 83 at 6, 7 & 9 and 95 at 7.)

**4.** Dr. Juliá recommended that A.C.P. be treated with supportive psychotherapy and continued educational and vocational programs.

cause he has been assaulted on several occasions at the Puerto Rico detention center, he should be transferred because keeping him there would undermine any attempt to treat his behavioral problems in light of the possibility that the assaults were sure to recur. This argument simply ignores the ample evidence regarding A.C.P.'s rehabilitation at the juvenile detention center and negates the reality of life within federal adult detention centers.

According to Social Worker Ivelisse Gomez, A.C.P. has evolved into a positive leader in the module where he lives, and in the correctional facility in general, as well as a good role model for new youngsters coming into the unit. (*See* Docket Nos. 56 at 32; and 83 at 4.) He shows consistent significant improvement in his self-control, cooperation, maturity, introspection about his past mistakes, and determined interest in self-improvement. He participates in daily school sessions and his teacher reports excellent progress. He recently took the College Board exam and is planning to get his GED. He participates positively in all aspects of his correctional experience such as groups, sports, learning, religious education, and educational training by mental health and addictions counselors. He also began writing, on his own initiative, a series of self-reflections about his experiences, which he plans to disseminate to other youths to help them avoid getting into predicaments similar to his own. Ms. Gomez further indicates that A.C.P. is more extroverted, open and able to communicate his feelings appropriately and seeks help when there are difficulties with other inmates at the institution. She stated that there have been instances in which other youngsters trying to compete for power within the unit have physically assaulted A.C.P., yet he had not responded with aggression, demonstrating outstanding self-control. It is worth mentioning that the aggressions have been prompted by the fact that the youthful offenders are aware he is cooperating with the government. (*See* Docket No. 83.) Ms. Gomez conclusions are consistent with Dr. Juliá's own observations in that she noticed a difference when she evaluated A.C.P. for the first time and the second time indicating that he now shows a sense of regret and self-evaluation and how that has played a role in his interest in helping other youth like him from staying away from trouble. (*See id.;* Docket No. 95 at 27.) Dr. Juliá concurs with Ms. Gomez in that he "has great possibilities of rehabilitation particularly if he has good support, supervision and follow up since he has demonstrated excellent progress and ability to use the structure and help he has received at their correctional facility." (Docket No. 83 at 9.)

Ms. Melissa Flores, A.C.P.'s substance abuse counselor, and Ms. Lucy Colon, the social worker in charge of his mental-health individualized plan, both agree that he has consistently been meeting his treatment objectives and has shown good progress with respect to improved ability to make decisions, make appropriate judgments, improved impulse control, meet educational and drug rehabilitation goals, improved emotional well-being and adjustment, as well as improved behavioral and cognitive controls. (*See* Docket No. 83.)

As is evident by the testimony of the social workers and experts who have worked with A.C.P., his response to the rehabilitation efforts during his detention at the juvenile center is commendable. Other than arguing they provide vocational training, the government fails to proffer evidence to show how placing A.C.P. in an *adult federal institution would undermine* the rehabilitation goals attained. If fact, placing the juvenile in an unknown environment with others who are not his peers could in fact be so counterproductive that

it could result in rendering useless all that has been accomplished. His efforts are exemplary and without a doubt weigh heavily in favor of keeping him in the juvenile institution. As the Magistrate Judge concluded, the Court has before it a juvenile who has positively responded to institutional treatment and has matured during the past year, recognizing his past mistakes.

The government insists, notwithstanding, that the mere heinousness of A.C.P.'s crime demands that he be tried as an adult.

On January 19, 2004, A.C.P, along with other individuals, attempted to steal money from an ATM machine. In the process, two guards were tied up at gun point and driven away from the machine. A third guard, which had approached the scene twice already, returned for a third time and while attempting to flee, was shot three times by A.C.P. He survived the attack, but remained unconscious in the hospital for approximately one month.

On April 4, 2004, just three days prior to his arrest, A.C.P. along with others again attempted, this time unsuccessfully, to steal money from another ATM machine. Also prior to his arrest, he had been involved in low scale drug sales from the same individuals with whom he participated with in the ATM burglaries.

> In considering the nature of the offense... the court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms. Such a factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer.

18 U.S.C.A. § 5032.

A.C.P.'s actions were indeed violent. He would have likely continued in his delinquent path had he not been arrested. Pointing a gun at someone and shooting a person several times are acts that demonstrate total disrespect for human life. Yet, as the Magistrate Judge indicated, A.C.P. was not a leader, organizer or planner among his co-perpetrators. The evidence in fact showed A.C.P. was being prepped for higher rankings in the criminal ladder, however, at the time of his arrest, he had no prominent role and was merely a participant. (*See* Docket No. 56 at 41.) What is more, the Court agrees with the Magistrate Judge that this should not be the conclusive factor. A review of the evidence shows that A.C.P. regrets his actions. (*See* Docket Nos. 56 at 39; and 95 at 83–84.) The Magistrate had the opportunity to study the minor's demeanor and concluded his testimony was sincere and credible. (*See* Docket No. 103 at 18, n. 7.)

Furthermore, A.C.P. has greatly cooperated with the government and actively participated in all rehabilitative efforts at the detention center. Because the transfer hearing was delayed several times, the Court had the benefit of plentiful information regarding all the transfer factors and thus cannot simply give weight to this factor alone and disregard the compelling evidence regarding the other factors. The circumstances surrounding A.C.P.'s social background; the lack of a prior delinquency record; his outstanding intellectual development and psychological maturity; his remarkable response to rehabilitation efforts; as well as the availability of such programs were he to continue within the Puerto Rico juvenile system, tilt the balance in favor of keeping A.C.P. as a juvenile. Moreover, A.C.P. has provided excellent cooperation to the government.

Because of his assistance, the government successfully investigated, indicted, and prosecuted various dangerous adult individuals with whom. A.C.P. had associated. Without the information A.C.P. provided, the government did not have enough evidence to indict these individuals. (*See* Docket No. 95 at 66 *et seq.*, proffer by AUSA Nathan J. Schutle).

This is truly a rare case in which the Court has before it abundant information regarding the juvenile's post-arrest response to rehabilitation efforts and immediate and extensive cooperation with the government[5]. Seldom does the Court have the opportunity to study how a juvenile has adapted to the detention center's environment and how he has responded to treatment. The evidence in the record shows that A.C.P. exemplifies the reason why the underlying purpose of the federal juvenile delinquency process is to encourage treatment and rehabilitation. He has made amends for his past transgressions, has met his rehabilitation goals, has achieved educational progress, and has become a positive influence to others. What more can the Court ask of this young man but to continue and encourage his progress down the path of righteousness? The system has proved effective, and we are hesitant to remove him from such a successful rehabilitative environment.

### CONCLUSION

For the anteceding reasons, the Court APPROVES AND ADOPTS the Magistrate Judge's R & R and denies the government's request to transfer A.C.P. to adult status.

**IT SO ORDERED.**

---

5. A.C.P. began cooperation soon after his arrest.